[Civ. No. 11824. First Dist., Div. One. Feb. 2, 1944.]

ADA AEBLI et al., Plaintiffs and Appellants; FLOYD S. FRENCH et al., Respondents, v. BOARD OF EDUCATION OF THE CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Appellants; and consolidated cases.

708

Piccirillo & Wolf for Plaintiffs and Appellants.

John J. O'Toole, City Attorney, Walter A. Dold, Chief Deputy City Attorney, and Irving Breyer for Defendants and Appellants.

Franklyn M. O'Brien and O'Brien, Dibert & Acton for Respondents.

PETERS, P. J.—In 1932 the Board of Education of the City and County of San Francisco hired Wilbur S. Owensby

to examine and audit the books, records and accounts of the school department, with particular regard to the service status rating classification and salary of all of the teachers in the department. In San Francisco salaries of teachers are fixed by a salary schedule, the amount of salary being dependent and rated according to years of service. Owensby made an exhaustive investigation and audit, and reported to the board that all of the 189 teachers involved in these proceedings had been overrated due to errors of various kinds, and consequently overpaid for periods varying from one to more than ten years prior to 1932. He recommended that the service status rating of each of these teachers be re-rated downward in accordance with his interpretation of the rules of the board in effect when these teachers were first employed. Some of the errors in rating were due to errors in calculation made by employees of the board, either purely mechanical or caused by errors in interpretation or application of the rules of the board, while others were due to the fact that when these teachers were first hired they were given by the board as it was then constituted ratings, which, according to Owensby's views, were too high and in violation of the rules of the board as they then existed. The board in 1932 adopted Owensby's recommendations. It proceeded to re-rate these 189 teachers downward, and also took steps to recover from such teachers the amount of the alleged overpayments for a period of two years next preceding July 1, 1932, that being the date of the beginning of the next succeeding school year. Although, in most cases, the alleged errors in rating had occurred more than two years prior to the re-rating of 1932, the charge back was limited to two years on the theory that recovery of excess payments beyond that period was barred by the statute of limitations. The revised rating was also applied in making salary payments for the school year commencing July 1, 1932, and for all subsequent years. The net result of the action of the board in 1932 was that these 189 teachers had deducted from their salaries in installments substantial sums of money alleged to have been overpaid them for the period 1930-1932, and, for the period starting July 1, 1932, their ratings, and consequently their salaries, were substantially reduced below what their ratings were in 1931-1932, and prior thereto. The teachers affected protested the deductions and reductions in salary, and immediately instituted these eight mandamus pro-

ceedings which have been consolidated. In these actions the 189 teachers affected seek the recovery of the amounts charged back against their salaries as excess payments for the period 1930-1932, and also seek by mandamus to compel the board to give to them for the school year starting July 1, 1932, and thereafter, the ratings they had prior to the re-rating of 1932.

After a lengthy trial (the reporter's transcript contains 3425 pages), the trial judge, the Honorable C. J. Goodell, prepared two opinions in which he discussed the law and the facts applicable to each of the litigants. Thereafter complete and carefully prepared findings and conclusions of law were filed. Generally speaking the trial court divided the 189 teachers into three main groups.

As to group one, involving the so-called "mechanical" error cases (which group is, itself, divided into several distinct categories hereafter discussed), it was held that the teachers included therein could neither recover the amounts charged back against their salaries, nor were they entitled to be restored to their ratings as they existed prior to the re-rating of 1932. The court found that these teachers had been rated too high due to "mechanical and clerical errors," of employees of the board, mainly of the paymaster's department, without authorization by the board. It was held that the board was legally required to place the teachers in this group on their correct salary rating as soon as the errors were discovered, and to collect back all overpayments based on the alleged errors not barred by the statute of limitations.

As to the second group, involving the so-called "non-uniformity" cases (also divided into several categories hereafter discussed), the court found that the teachers included therein were entitled to recover the alleged excess payments charged back against their salaries, but, that the board could and did lawfully re-rate them downward effective as of the commencement of the school year 1932-1933. In other words, as to this group it was held, that the board could change its ratings prospectively, but it could not do so retroactively.

The third group included but six teachers. As to them the trial court held that because of facts peculiar to their individual cases the board was estopped from charging back the allegedly excess payments and from changing their ratings prospectively for the school year 1932-1933, and thereafter.

In other words, it was held that, regardless of any error that may have been committed when the teachers were originally rated, the board, because of facts peculiar to each of the six cases, was estopped from re-rating these teachers either prospectively or retroactively.

The teachers in the first group appeal from the judgment insofar as it denies them relief both prospectively and retroactively. Their main contentions are that there were no errors in the original ratings, but even if there were, the teachers had a vested right in the original ratings; that the board had no lawful right to interfere with that vested right; that the board ratified the errors, if any there were; that the board is now estopped to claim error.

The teachers in the second group appeal from the judgment insofar as it sustained the right of the board to re-rate them prospectively for the year commencing July 1, 1932. The teachers here involved make the same contentions as those in the first group, and, in addition, point out that every teacher in this group had his or her original rating fixed by formal resolution of the board. It is contended that the board as it was constituted in 1932 had no lawful right to overrule or change a right granted by an earlier board in the exercise of its discretion. The board appeals from the judgment insofar as it sustains the right of the teachers in this group to recover amounts charged back against current salary. The main thought of the board is that these teachers were originally erroneously rated, and that it was the duty of the board, upon discovering the error, not only to re-rate them prospectively but to recover overpayments based upon the error.

The board appeals from the judgment in favor of the six teachers in the third group, it being contended that no lawful basis for an estoppel exists.

Before directly discussing the contentions of the parties some reference must be made to the salary schedule of the school department and to the rules applicable thereto. The salaries of certificated personnel in the school department are not fixed by separate contract with each employee. Such salaries are fixed by a salary schedule, the amount of salary being dependent upon years of service. Each year, between May 1st and May 21st, the board, acting pursuant to the provisions of the city charter and of the School Code, adopted a schedule of salaries for teachers for the next ensuing school year, which starts on July 1st. Such schedules when once

worked out were not changed each year. Frequently the board would readopt the schedule for the preceding year. For the school year 1925-1926 a new salary schedule was adopted. That schedule was readopted each succeeding year until 1930-1931 when a new schedule was adopted. This last mentioned schedule remained in effect through the school year 1932-1933. These schedules fixed the salaries of the teachers in the several divisions of the school system, a separate schedule being set forth for teachers in the elementary schools, continuation or part-time high schools, junior high schools, attendance officers and senior high schools. In these schedules the salary of each teacher depends upon her "service status rating," which in turn depends upon her years of service. The 1925-1926 schedule has twelve "service status ratings" for each division, designated 1st through 12th, except that the ratings for attendance officers stop at 9th. The schedule for 1930-1931 shows fifteen "service status ratings," with ten for attendance officers. Salaries rise as the rating progresses. When a teacher has acquired the last "service status rating" listed in the schedule for her division, she has reached the maximum salary rating, and thereafter is paid according to that maximum.

These various salary schedules usually contained a provision that the service status rating of the teachers should advance one position each year. Thus, in general, there was an advance of one place in service status rating for each year in the department. There were, however, exceptions to this rule. Thus in 1925-1926, after the salary schedule for that year had been adopted, the board of supervisors made available an additional sum of money to give the teachers an increase in salary. In order to accomplish this result, it being too late, apparently, to revise the salary schedule, the board of education provided that teachers should be advanced more than one place in service status rating for the year 1925-1926. In 1930, as already pointed out, a new schedule was adopted. That schedule contained substantial raises for all high school teachers over the corresponding salaries contained in the schedule for the preceding year. The board concluded that to give the higher rate, and, at the same time advance the high school teachers one year in rating, would result in too great an increase. Hence, by resolution, the ratings for high school teachers were "frozen." Each teacher in the "frozen"

group was to retain the rating of the preceding year. In 1932 the entire schedule was "frozen" and no raises at all allowed for several years thereafter. Under such a system the amount of salary received by each teacher depends on seniority, until the maximum has been reached.

Another problem should be generally mentioned. When a teacher first enters the department it is necessary for the board to determine whether she is to be entitled to any credit for experience, either teaching or non-teaching, gained outside the San Francisco School Department. The board determined to give credit for outside experience. To this end, the board on August 11, 1925, adopted a series of rules entitled "Credit for Teaching Experience Elsewhere and in Other Classes of Schools." These rules purported to state what credit would be allowed not only for outside teaching experience, but also for outside "vocational experience in industry and commerce." These rules remained in effect until May of 1930, when they were modified in certain respects, and then in February of 1932 the board changed its entire policy on this subject. At that time the board abolished the giving of credit for salary purposes for outside experience, and thereafter commenced all new teachers on the first year of the salary schedule.

Under the rules adopted in 1925 the applicant for a position would submit to an employee of the board her credentials, including a detailed reference to her outside experience. In January, 1926, there was created a department of personnel whose duty it was to make the preliminary survey. The department of personnel did not always rigidly apply the 1925 rules. Moreover, many applicants had had experience of a type not covered by the rules. The department would calculate a rating for the applicant. This recommendation would be submitted to the personnel committee of the board, composed of three members of the board. This committee would then transmit the recommendation to the full board. The board would then by formal resolution approve, reject or modify this rating, and would provide for the hiring of the teacher at the rating so fixed. In the various cases here involved there are seventy-five teachers (hereafter discussed in detail under the "non-uniformity" cases) whose ratings were thus fixed by formal resolution in the years 1925 through 1931, and who strenuously object to being re-rated *ab initio* in 1932.

When the board determined to its satisfaction from Owens-

by's report that a particular teacher had been originally, due to some error, improperly rated and therefore improperly compensated at a rate of salary higher than that to which she was entitled, it sent, prior to the commencement of the school year 1932-1933, a letter to each teacher. This letter informed her that for certain specified years she had drawn salary in excess of the uniform schedule of salary rates fixed by the board for other teachers of the same experience and classification. She was then informed that since July 1, 1930, she had been overrated and the amount of excess salary alleged to have been received was specified. She was told that she had the option of reimbursing the department for the overpayment either by an immediate lump sum payment, or in monthly payments to be deducted from her salary from June 30, 1932, to October 31, 1933.

The teachers contend that even if they owed the board money for the overpayments, and even if the board could sue them and recover the overpayments, it had no power to exercise the right of self-help by thus deducting sums from their salaries without their consent, at least after the teachers had challenged the validity of the claims by filing these actions. The teachers did not attempt to enjoin the deductions. When these cases went to trial all the deductions had been made and the money impounded by the board. While we have some doubt of the propriety of a governmental agency, after it has determined that an employee owes it money, to deduct all or part of the amount claimed from the employee's salary after the employee has challenged the validity of the claim, and before the validity has been determined, we have no doubt at all that if the employee does not see fit to take steps to see that the money is impounded by the court until the validity of the claim is determined, and then it is determined the employee owed the money, he has waived any objections to the method pursued. In the instant case it has been determined that some of these teachers owed the board various sums of money. Before these cases were tried, the board, by the exercise of a form of self-help, deducted the sums owed to it from these teachers' salaries. If the teachers in fact owed the money they are in no position at this late date to complain of the procedure adopted by the board.

The board insists that all of the petitions for mandate in all of the cases must be denied because the teachers did

not exhaust their administrative remedies before instituting these proceedings. ■ It is, of course, well settled that available administrative remedies must be exhausted before redress is had to the courts. (*Abelleira* v. *District Court of Appeal*, 17 Cal.2d 280 [109 P.2d 942, 132 A.L.R. 715]; *Alexander* v. *State Personnel Bd.*, 22 Cal.2d 198 [137 P.2d 433].) The board urges that §§ 5.760 and 5.761 of the School Code provide an administrative remedy that should have been utilized before these mandamus proceedings were instituted. Section 5.760 provides that: "Any teacher whose salary is withheld may appeal to the superintendent of public instruction, who shall thereupon require the superintendent of schools to investigate the matter and present the facts thereof to him." The next section provides that: "The judgment of the superintendent of public instruction shall be final; and upon receiving it the superintendent of schools, if the judgment is in favor of the teacher, shall, in case the trustees refuse to issue an order for said withheld salary, issue his requisition in favor of said teacher."

■ These sections have no application to these appeals. These cases do not involve disputes over whether warrants of the teachers were being properly withheld. Here the warrants were made out and delivered to the teachers each month, with a deduction from the amount admittedly owed. The dispute is over the right of the board to re-rate in 1932. The superintendent of public instruction has no power to pass on the complicated questions of law and fact concerning the proper rating of these teachers. The partial salary withholding feature of the case was incidental to this main feature. Under such circumstances there were no administrative remedies available and mandamus was the proper remedy. (See, *Dupuy* v. *Board of Education*, 106 Cal.App. 533 [289 P. 689]; *Williams* v. *Bagnelle*, 138 Cal. 699 [72 P. 408].)

In their closing brief the teachers argue at some length that whatever right the board may have had to deduct for the overpayments during 1930-1932, it at no time notified the teachers, prior to July 1, 1932, that their compensation for the year 1932-1933 would be pursuant to the reduced rating. It is urged that the notices sent to them in May and June, 1932, merely notified them of their reduced ratings and of the amount of the excess salary received by them prior to June 1, 1932. It is also urged that the re-rating resolution itself did not purport to re-rate for the future.

No useful purpose would be served by setting forth the form of letter and the resolution in this opinion. It is true that the letter does not expressly state what the teacher's rating for 1932-1933 will be. But the clear and inevitable implication of the letter, and of the resolution, was that future ratings would be based on the ratings as reduced. Thus the letter to Miss Cushman, which is typical, informs her that she should have been rated 11th year for 1931-1932, but that she had been erroneously rated 12th year. It is true that in her case the court held that the board was without legal right to reduce her rating and salary retroactively for 1931-1932 and that she should be paid on 12th year rating for that year. But the letter clearly indicated the board's intent that she should be reduced in rating for the future. To anyone familiar with the salary schedule of the San Francisco School Department and familiar with the method of rating teachers, as all the teachers here involved were, the letter could have no other meaning.

### The Clerical or Mechanical Error Cases

*In general.*

As already noted, the trial court held, as to the group of cases where the error in rating was mechanical or clerical, that the board was legally justified in re-rating retroactively and prospectively—that is, that the board could collect the overpayments for the two-year period 1930-1932, and was justified in lowering the ratings of these teachers for the future. There are several categories within this large group and some teachers appear in more than one category. These main categories will be separately considered.

*The "split year" cases.*

The trial court correctly placed 47 teachers in this category. Their names and the facts relating to each of their cases are set forth fully in the findings and need not be set forth herein. These cases arose in connection with the granting of the so-called "big raise" in the school year 1925-1926. As already pointed out, the salary schedule for this school year was adopted before the money for the raise of at least $360 per year for each teacher was made available. For this reason a salary schedule without providing for the $360 raise was adopted. But, contingent upon money being made available for the "big raise" the schedule provided as follows:

"Under the provisions of this Salary Schedule and of the rules governing the placing of teachers now in service upon the new Schedules, all full-time teachers, all principals, supervisors and assistant supervisors in the day schools will receive during the next school year (1925-1926) an increase of not less than Three Hundred and Sixty Dollars above that which they received during the school year 1924-1925, apart from small odd amounts added or subtracted in order to fit the teachers' salaries exactly into the new schedule."

This raise was accomplished through placing teachers in a higher rating of the 1925-1926 salary schedule than they would have received with only the usual one year advance of rating. The salary schedule contained a section indicating where on the old schedule (1924-1925) were to be placed the various salary brackets of the 1925-1926 schedule. For example, an elementary teacher who had been receiving a salary of $1400 for the year 1924-1925, the lowest or first service status rating, was to receive $1824 for 1925-1926. In order to arrive at this figure, the schedule adopted a most complicated procedure. As to some of the teachers, it provided that they should be paid on a "split year" basis. For example, the schedule provided that a teacher who was on first year rating for 1924-1925, instead of being placed on second rating for the next school year, was to be jumped and placed on the 5th year rating for the first half of the school year 1925-1926, and on the 6th year rating for the second half. The salary for the 5th year rating on the 1925-1926 salary schedule was $1776, that for the 6th year rating, $1872. One-half of $1776 plus one-half of $1872 is $1824. This feature of paying for one-half of the year according to the 5th rating, and one-half according to the 6th year salary was designated the "split year" rating. On the other hand, a teacher who had 2nd rating in 1924-1925 and received a salary of $1450 that year was advanced to the 6th rating on the 1925-1926 salary schedule, which carried a salary of $1872. Thus the schedule continued up through the various salary ratings. Some ratings were advanced without this "split year" method and others with it. This made the salary schedule most complicated, but the board's schedule expressly provided for this "split year" system as to certain of the salary brackets and not as to others. No complaint is here made of the board having adopted this procedure. The error which Mr. Owensby found was in the continuance of the "split year" rating

beyond the year 1925-1926. In Mr. Owensby's analysis of the 1925-1926 salary schedule, which was adopted as the schedule for the succeeding years until the year 1930-1931, the teacher with "split year" rating 5½ for 1925-1926 (one-half of year at 5th year rating, second half at 6th) should for the year commencing July 1, 1926 (1926-1927) have been placed on straight 6th year rating and have continued at that rating until the year 1927-1928, when she would have gone on 7th rating for the year commencing July 1, 1927. Instead, for 1926-1927 she was given 6½ "split year" rating, on 6th the first half of the year and on 7th from January, 1927, to June 30, 1927. This continued, that is, advancement on such plan, until the school year 1930-1931. A new schedule was adopted for that year. At that time the board's paymaster or superintendent of schools, or both, determined that the "split year" system should be then terminated. To accomplish that object elementary teachers on the "split year" rating were placed on the next even rating plus one, commencing with July 1, 1930. That is, the general rule for elementary teachers that year was that they advanced a year in rating. But if a teacher had 9½ year rating for 1929-1930, she was, at the commencement of the school year 1930-1931, given full 11th rating. In Mr. Owensby's view, and that of the trial court, the continuance of this "split year" system beyond the school year 1925-1926 was contrary to the provisions of the board's salary schedule for the year 1925-1926, readopted for succeeding years. If a teacher with 5½ rating during 1925-1926 had for the year 1926-1927 been given 6th rating and thereafter advanced one rating a year, she would for the year 1930-1931 have had 10th rating, instead of 11th.

This additional one-half year in rating given by the paymaster in 1930 did not only apply to elementary teachers. As already pointed out, the new salary schedule adopted in that year "froze" high school teachers. They were not given the usual one year advance in rating for that school year. This was because the 1930-1931 schedule was higher than the old schedule and it was felt that the increase in pay would be too large if the teachers got an advance in rating under the higher schedule. But for "split year" teachers in the high schools an advance was in effect given. That is a teacher on 9½ "split" rating for 1929-1930 was placed on 10th rat-

ing. If, for 1926-1927, she had been placed on 6th rating instead of 6½, as should have been done, she would have found herself for 1930-1931 with 9th rating, rather than 10th.

The theory of the board in 1932 was that this "split year" system was continued beyond the year 1925-1926 contrary to provisions of the board's salary schedule for 1925-1926, readopted for the years up to 1930-1931. In the board's view, its employees (either the paymaster or the paymaster acting under the direction of the superintendent of schools), acting under a misunderstanding of the board's direction as contained in the schedule and contrary thereto, continued the "split year" system, thereby giving certain teachers a higher rating than they would have had if the board's direction contained in the schedule had been followed.

The trial court found, in accordance with the board's interpretation of the salary schedule of 1925-1926 that under that schedule, insofar as it provided as to certain groups for the "split year" method of payment for that school year, such method of payment should have terminated with the school year commencing July 1, 1926; that at that time a teacher who was paid, for example, on the "split year" basis for 1925-1926 one-half on fifth year and one-half on sixth, should have been placed on 6th year rating commencing July 1, 1926, instead of 6½ year as was done; that "at no time has the said Department ever adopted or maintained a salary schedule based on semi-annual or split year rates and that when (after said $360.00 increase had been effected) said teachers were advanced from year to year, commencing with the school year 1926-1927, at such semi-annual or 'split year' ratings, they were so advanced in violation of said resolution of June 16, 1925, and as an unwarranted continuation of the plan for effecting said $360.00 increase, and that such advances and increases were made by reason of clerical error, inadvertence and mistake on the part of said Department and its employees" (Finding No. 61, Cl. Tr. p. 198); that by reason of these errors occurring in 1926 and in 1930 these teachers erroneously received a full year's increase in rating; that "none of said advances was made in the exercise of discretion or judgment in the rating of said teachers or any of them . . . that in charging said teachers, in 1932, with excessive payments which they had received during the two year period next immediately preceding the time when said charges were made, namely, for the difference between what

they received on the erroneous semi-annual or split year basis and what they should have received on the yearly basis shown on said schedule [and in re-rating these teachers prospectively since July 1, 1932] said Board was within its rights, and all such charges were legally and properly made; the Court finds that said overpayments were made to said teachers by and through mistake and clerical error and that all thereof were properly collectible back and were properly and legally collected, and that none of said teachers is entitled to collect back from the defendants any part thereof, or entitled to the mandate of this Court ordering any restoration or change in status.'' (Finding No. 18, Cl. Tr. p. 207.)

In considering the propriety of the trial court's ruling there are really two questions involved. The first problem is one of interpretation—that is, should the ''split year'' have been continued after July 1, 1926? The second problem involves a question of law, that is, assuming an error was committed by the employees of the board, could the board in 1932 lawfully recover back the amount overpaid during the period within the statute of limitations?

On the first question the teachers contend that there was no misinterpretation of the salary schedule, and that what was done was in accordance with the schedule. That the trial court properly construed the 1925-1926 schedule, which was readopted each year until 1930, is not open to reasonable doubt. In addition to the provision above quoted from the 1925-1926 salary schedule, there was another provision which read: ''The adjustments in salary of the teachers now in service to be made at the middle of next session, in order to give teachers proper amount of salary, shall continue in effect until the adjustment is made for August 1st, 1927.'' (This date, was, on July 22, 1925, changed to read ''July 1st, 1927.'') The salary schedule was adopted in May of 1925. The board in 1932, and the trial court, interpreted the reference to ''the middle of next session'' as referring to the middle of the 1925-1926 school year, when certain teachers were to be paid for the last half year at a higher rating than for the first half. In their analysis the above provision means that the salary paid for the last half of 1925-1926, was to continue as the salary for 1926-1927, that is until July 1, 1927, in all cases where there had been a middle session adjustment in the year 1925-1926. This appears to be the plain

. . .

purport of the provision. ■ The teachers, while not seriously contending that the quoted paragraph standing alone should not be so interpreted, seek to qualify the quoted paragraph by an earlier provision in the schedule which reads as follows: "Increases in salary on account of years of service in the San Francisco School Department will be made once annually; effect August 1 [later changed to July 1, as August 1 is an obvious error] each year." The teachers contend that any teacher on a "split year" basis for the school year 1925-1926, for example fifth year rating for the first half of the year and sixth for the second half, was to be rated one full year advance or 6½ for the school year 1926-1927. The obvious error in this construction is that the "middle of next session" paragraph above quoted is a particular provision applying to those with a "split year" rating, which controls the general provision for annual advancement in rating. The "annual" provision, relied upon by the teachers, obviously applied to those not on a "split year" basis, and applied to the "split year" teachers after July 1, 1927.

Once it is determined that the rating these teachers enjoyed in 1932 was the result of an error or mistake, the question next presented is whether the board could then recover the overpayments for the period within the statute of limitations. The trial judge fully discussed this problem in his first opinion. We are satisfied that his discussion adequately disposes of this phase of the problem. We therefore adopt as a portion of this opinion the following portions of the opinion of the trial court:

"In my opinion there is no doubt as to the Board's right to sue the teachers, and therefore none as to its right to deduct from money admittedly owing to them. The legal doctrine upon which the Board based its action in charging back the overpayments, and now justifies that action is that of mistake. The law recognizes and deals with two kinds of mistake,—that of law and that of fact. ■ As a general rule mistake of law is of no legal consequence, just as ignorance of the law is no excuse. ■ Mistake of fact, however, as a general rule furnishes a good ground for relief. ■ Moreover, the mistake need not be mutual, or known to or shared by the party receiving the money. ■ Money paid under a mistake of fact may be recovered back, however negligent the party paying may have been in making the mistake, unless the payment has caused such a change in the position of

the other party that it would be unjust to require him to refund. (*National Bank of California* v. *Miner,* 167 Cal. 532 [140 P. 27].)

"Now in these cases it is a close question whether the errors claimed by the Board to have been made by persons employed by the department, whereby the teachers were paid more than they were entitled to (according to the Board) were mistakes of fact or mistakes of law. As the various cases are discussed herein this question will be dealt with. ▮ Preliminarily, however, it is sufficient to point out that, generally speaking, where money is paid out by mistake by the state or an agency of government (whether by mistake of fact or mistake of law) it can be recovered back in many instances where, if paid out by an individual or by a private corporation it could not be.

"The reason for this, and the theory underlying it, is that the funds paid out are public funds,—trust funds,— and not the property of an individual who can deal with them as he pleases.

"Take as an illustration a case where the paymaster of the department erred in the interpretation of a section of the School Code or other legal enactment and because of such erroneous interpretation paid a teacher more than under the law rightly interpreted was coming to her. This would be a mistake of law.

"A comparatively recent case in Massachusetts clearly illustrates the rule. (*Norfolk County* v. *Cook,* 211 Mass. 390 [97 N.E. 778, Ann.Cas. 1913B 650].) Cook was clerk of the County Court of Norfolk County. The county seat was at Dedham. Cook lived at Weymouth, and journeyed each day from there to the courthouse and back. There was a law allowing clerks necessary travelling expenses, and Cook claimed the expenses of his daily trips and the County Commissioners allowed them. 'It seems' says the court, 'to have been supposed by all parties that the statute authorized the payment of these bills. There is no question of their good faith.' Here was a plain mistake of law. Cook and the County Commissioners simply misconstrued the law. Later it was held that the statute did not authorize the payments, whereupon the county demanded repayment by Cook, which he refused, and the County sued. The court in that case held that 'The county treasurer had no authority to pay, and the defendant no right to receive this money.'

"The following excerpt from the decision should be read with care:

"'His next contention is that the county commissioners as a court adjudicated that the money was due him, and that such adjudication is conclusive upon the county. But this is not tenable. So far as they acted within the statute they were by its plain language acting simply as auditors, and so far as they were acting outside the statute they were acting outside their jurisdiction.'

"And the following should also be noted well for it points out in exceptionally clear and unambiguous language the reason for the exception,—the reason that is to say, why a governmental agency can sue and recover back money paid by mistake (despite the fact that it is not by mistake of fact) where an individual cannot do so.

"'As the last ground of defense the defendant invokes for his protection the rule that money voluntarily paid under no mistake as to the facts cannot be recovered back. He takes the position that even if the transfer of the money from the treasury of the county to his pocket was illegal, and even if he neither then nor since has had any equitable right to it, still he will invoke this technical rule of law to keep the money if he can. Without stopping to comment upon the ethical aspects of such a defense we proceed to consider its legal aspects.

"'The rule is of very general application between individuals. An individual is dealing with his own money. If, to avoid trouble facing him in the shape of a lawsuit or in any other form, he with full knowledge of the facts and not under compulsion but voluntarily pays out money, he has waived his right to contest the validity of the claim. He is dealing with his own money and as a principal. He can do as he chooses with it and is answerable to no one. But public officers are dealing with money which is not their own and over which their powers are subject to well known limitations. They can pay when the law requires or permits, and they cannot pay when it forbids. So far as they act within their powers the public, whose agents they are, must abide the consequences. But when they act beyond their powers they do not bind their principals. The payment of this money in this case was not the act of the county, but simply the unauthorized act of a public officer. It was not the voluntary payment of money by the owner, but by one who had no

beneficial interest in it and who was not authorized by the principal to make the payment. Manifestly one of the chief conditions for the application of the rule is wanting. To such a condition of things the rule does not apply; and such is the great weight of authority.' (Citing cases.)

"See also the annotation at pages 651-653.

"A leading case on the same subject is *State of Iowa* v. *Young,* 134 Iowa 505 [110 N.W. 292, 13 Ann.Cas. 345]; where the subject is fully discussed and numerous cases cited both in the decision and in the annotation following it. It comes to the same conclusion as the Massachusetts case just cited, and arrives at that conclusion by the same process of reasoning.

"See also *Jones County* v. *Arnold,* 134 Iowa 580 [111 N.W. 973], and *County of Pocahontas* v. *Katz-Craig Contracting Co.,* 181 Iowa 1313, 1323 [165 N.W. 422].

"The trust fund rule was applied in this state in the case of *City of Petaluma* v. *Hickey,* 90 Cal.App. 616 [266 P. 613]. There the City of Petaluma had paid out upwards of $3000 and sued to get it back. The money had been paid out under circumstances which made it neither a mistake of fact nor of law, but it was held that the money was a trust fund and that the person to whom it had been paid had become an involuntary trustee. The City could not recover, however, for the single reason that it had not brought suit in time,— its claim on the trust theory being barred by the statute of limitations.

"The case of *Puterbaugh* v. *Wadham,* 162 Cal. 611, 620 [123 P. 804], tacitly recognizes and applies the same rule, holding past overpayments to be deductible from salary." (Opinion quoted in entirety Res. Br. pp. 69-131; part here quoted Res. Br. pp. 76-81.)

In addition to the cases cited above, the following cases hold that money paid out by a governmental agency under either mistake of fact or law may be recovered from the payee: *Foster* v. *Pension Board,* 23 Cal.App.2d 550 [73 P.2d 631]; *City of Duluth* v. *McDonnell,* 61 Minn. 288 [63 N.W. 727]; *Chrysler Light & Power Co.* v. *City of Belfield,* 58 N.D. 33 [224 N.W. 871, 63 A.L.R. 1337]; *Independent School Dist. No. 6* v. *Mittry,* 39 Idaho 282 [226 P. 1076]; *Inhabitants of City of Biddleford* v. *Benoit,* 128 Me. 240 [147 A. 151]; *United States* v. *Barlow,* 132 U.S. 271 [10 S.Ct. 77, 33 L.Ed.

346]; *Wisconsin Central R. Co.* v. *United States,* 164 U.S. 190 [17 S.Ct. 45, 41 L.Ed. 399]; *Haralson County* v. *Golden,* 104 Ga. 19 [30 S.E. 380]. It should be added that the good faith of the payee in no way affects the applicability of the above rules. (*Smith* v. *Rubel,* 140 Ore. 422 [13 P.2d 1078, 87 A.L.R. 644]; *Grand Lodge, A.O.U.W. of Minnesota* v. *Towne,* 136 Minn. 72 [161 N.W. 403, L.R.A. 1917E 344].)

The teachers, as to this and all other cases of error, urge that the ratings having been once given, although based on error, are final, and, that in any event, the board is estopped from challenging, or that the board has ratified, the ratings. It should be noted that we are not here dealing with ratings given by the board after full examination of the facts by the board. That problem will be discussed hereafter. We are here dealing with errors of employees of the board in applying the will of the board as disclosed in its resolutions or in the salary schedule. The so-called "mechanical error" cases were the result of employees of the board erroneously interpreting the salary schedule passed by the board or in interpreting some resolution of the board. Certainly it cannot be urged successfully that the employees of the board in rating teachers and paying their salary and in interpreting the resolutions of the board acted in a judicial or quasi judicial capacity so that their determinations would become res judicata. Yet this is the necessary import of the argument of the teachers on this point.

The same fallacy exists in the arguments based on estoppel and ratification. It is urged that, however erroneous the interpretation by the employees of the salary schedule and other resolutions of the board may have been, the board should have known in what manner the paymaster's department was violating the resolutions. It is also urged that the records of the board were open to the board, and that such records revealed the true situation. The above cited cases establish beyond a doubt that in the absence of unusual circumstances not here present an illegal payment of public funds cannot be ratified nor can recovery be estopped. There is no doubt a modern tendency to invoke estoppels against public authority in exceptional circumstances. (*La Societe Francaise* v. *California Emp. Com.,* 56 Cal.App.2d 534 [133 P.2d 47]; *Times-Mirror Co.* v. *Superior Court,* 3 Cal.2d 309 [44 P.2d 547]; *McGee* v. *City of Los Angeles,* 6 Cal.2d 390

[5 P:2d 925] ; *City of Los Angeles* v. *County of Los Angeles*, 9 Cal.2d 624 [72 P.2d 138, 113 A.L.R. 370].) But these cases all involved most unusual sets of facts. There is no doubt that the general rule is that estoppels will not be invoked against the government or its agencies except in rare and unusual circumstances. (See cases collected 19 Am.Jur. p. 818, § 166.) No unusual circumstances are here presented. It is a simple case of employees of the board erroneously interpreting the will of the board and illegally paying out money to those not lawfully entitled. We conclude that in this, as well as in all the other mechanical error cases, the board upon discovering the error, lawfully could recover the illegal payments for the period not barred by the statute of limitations, and, of course, was required to restore the teachers involved to their proper ratings.

*The "frozen year" cases.*

As to the group of teachers here involved the trial court, as in the "split year" cases, held there was mechanical error, and for that reason the teachers were without right to recover the deductions, or to be re-rated prospectively. The trial court found, as to this group of cases, that the employees of the board, in applying and interpreting the salary schedule, acted contrary to the will of the board as disclosed by the resolutions of the board.

As has already been pointed out, the salary schedule for 1930-1931 gave a substantial raise in salary for each of the ratings relating to senior and junior high schools, but gave no such similar raise to elementary teachers. The board determined that to give the high school teachers both the raise and the usual one year advance in rating would result in giving those teachers more of an increase than the board intended. To prevent this result the board determined to "freeze" the status of the high school teachers for one year —that is, to keep their service status ratings for 1930-1931 identical with those existing in 1929-1930. Inasmuch as the elementary teachers did not receive a raise, their service status ratings were not frozen. The "freezing" resolution was adopted on May 21, 1930, and reads as follows: "All senior high school teachers [an identical resolution was adopted relating to Junior High School teachers] with less than twelve years service shall be placed beginning July, 1930, on the year of the new schedule corresponding to their

service status as of the date of the adoption of this schedule, and shall advance thereon according to the requirements and effective dates set forth, except that in no event shall a teacher now in the service suffer a reduction of salary by virtue of the adoption of the new schedule.''

Many of the cases now under discussion involve elementary teachers who were transferred to the junior or senior high schools effective July 1, 1930. If those teachers had remained in the elementary division they would have advanced a year in rating. The board's employees advanced them one place in rating notwithstanding the transfer to high school. The result was that a teacher with two years' teaching experience in the junior high remained on second rating for 1930-1931, but the elementary teacher transferred to the junior high with two years' elementary experience received third rating on the junior high schedule, getting a higher salary than the teacher whose entire experience had been in the junior high. The re-rating of 1932 placed such transfers on the same basis as those who were junior high teachers and were ''frozen.''

Other elementary teachers involved in this group were transferred effective as of July 1, 1931. Salary ratings did not freeze for the year 1931-1932. But it is perfectly obvious that if an elementary teacher was, for example, advanced from second to third rating for 1930-1931 (which was perfectly proper) and then, when she was transferred to the high school division commencing July 1, 1931, if she were to be advanced to fourth rating, she would be one year ahead of the junior or senior high school teacher of similar years experience all of whose experience had been in the high school. That is exactly what the employees of the board did.

The same situation existed as to new entrants in the department. Outside teachers were given credit for each year of their outside teaching experience, less one. As a result such new entrant was placed on the salary schedule one year ahead of high school teachers in the San Francisco department with equal experience whose entire teaching had been done in the San Francisco high schools.

A somewhat similar situation existed as to attendance officers. Before 1930-1931 their separate salary schedule was midway between elementary and junior high. The salary schedule of 1930-1931 placed them on the junior high schedule. The board's employees did not ''freeze'' their ratings, but

permitted an advance of one place. Thus if an attendance officer had second rating, she was advanced to third rating and given the same salary as third rating junior high teachers. Thus an attendance officer who, for 1929-1930 had second rating and received less than a junior high teacher with second rating, in 1930-1931 was paid on the basis of third junior high rating, receiving more than the junior high teacher with equal experience.

The re-rating of 1932 reduced these several groups one place in rating so as to give them one frozen year, and provided for the recovery of the overpayments. The trial court approved these actions of the board, holding that all of these teachers should have been frozen in the schedule for one year.

That this determination was correct seems obvious. When the purpose of the freezing resolution is considered, it seems clear that these groups were intended to be included in the frozen group. Such conclusion is predicated upon the scheme of the 1930-1931 schedule as a whole, rather than upon any particular provision of the schedule. For the reasons and upon the authorities discussed under the "split year" cases this portion of the judgment should be affirmed.

*The vice-principal cases.*

This category includes four vice-principals. The problems here involved also grow out of the 1930-1931 salary schedule. Under that schedule vice-principals were given a rating on the teacher's service status rating schedule, and in addition to the teacher's salary for that rating received a flat sum of $300 per year in addition, except for Class B, elementary schools, where $240 per year additional was received.

The salary schedule for 1930-1931 was adopted by the board on May 21, 1930. In reference to vice-principals the schedule provided: "All vice principals, except those of Class B, elementary schools, who shall not have had at the time of the adoption of this schedule the respective service status as listed above [14th and 15th year ratings], shall receive the salary, on the new schedule for their respective teacher groups, of a year, three years in advance for their 1929-1930 service status plus $300 per annum." A similar provision applied to Class B, elementary school vice-principals, except that their flat raise was to be $240. It will be noted that under this schedule, vice-principals "at the time of the adoption of this schedule" who had not already

reached maximum rating, were to receive for 1930-1931 a three-year jump in rating plus an additional sum of either $300 or $240 per year.

■ The four vice-principals here involved were not vice-principals "at the time of the adoption of this schedule." They were appointed vice-principals after May 21, 1930, either for the school year 1930-1931, or for the school year 1931-1932. The paymaster nevertheless gave these four vice-principals a three-year advance in rating upon their appointment, in addition to the flat sum increase to which they were undoubtedly entitled. This was clearly an erroneous application of the schedule. The board had determined that the extra raise of a three-year jump in rating should be limited to those in service on May 21, 1930. That classification was based on the theory that most of the vice-principals already in service had years of experience in their positions and were entitled to the extra big raise of three jumps in rating. Acting well within its powers, the board determined that newly appointed and therefore inexperienced vice-principals were not entitled to this consideration. The paymaster clearly acted in violation of the board's mandate. The rating as to the group here involved was therefore erroneous. The board, for reasons fully discussed in connection with the "split year" cases, properly collected back the overpayments, and properly placed these persons on their proper ratings. The judgment should be affirmed as to them.

*Cases where the teachers admit error.*

In the cases of Nellie Foley, Frances Murphy, Edna Jiminez Herrington, Dorothy Reilly and Ruth Peabody, counsel for the teachers admits that a purely mechanical error was made in their ratings by the employees of the board. To this group should be added Emma Betts, not mentioned in the brief of the teachers.

■ As to these teachers the trial court found that "for some unexplained reason or for no reason at all," or "through some clerical error and mistake, which is wholly unexplained," or "for some unexplained reason and because of clerical error," or because of "error and inadvertence," the paymaster gave these teachers a higher rating than they were entitled to under the resolutions of the board. For example, teacher Nellie Foley was given fifth year rating by resolution of the board in 1926. The paymaster erroneously placed her

in the seventh year. The other five cases are similar. These cases furnish the clearest examples in the record of purely mechanical errors by which the teachers involved were overrated. The board properly recovered the overpayments made to these teachers, and properly re-rated them in 1932 by placing them on their proper rating. The judgment as to them should be affirmed.

*Miscellaneous cases.*

The teachers list five persons under this heading. As contended by the board, and as found by the trial court, all five of these cases fall within one or more of the categories heretofore or hereafter discussed.

Perry Kittredge for the school year 1924-1925 was entitled to a rating calling for an $1800 salary. He was paid at that rating until February, 1925, when for some unexplained reason he was raised to the next rating by the paymaster at $1900 per year. There is no evidence of any resolution warranting the raise in rating, and no evidence of any practice or custom of thus raising a teacher in mid-year. This rating was clearly the result of some mechanical and wholly unexplained error by the paymaster's department.

The board admits that Charlotte Morton should be in the "non-uniformity" group, hereafter discussed. The rulings hereafter made as to that group will apply to this teacher.

Mary Rossi falls both within the "frozen" year cases, heretofore discussed, and the "nine months rule" cases, hereafter discussed. The respective rulings there made as to each group shall apply to this teacher.

The cases of Kathryn Coles and Eloisa Courtright fall within the "nine months rule" and the "split year" categories, and the respective rulings made as to those categories shall apply to these two teachers.

*Conclusion as to mechanical error cases.*

The above constitute the main groups found by the trial court to fall within the mechanical error category. We are convinced that as to all of these cases (those mentioned above as well as those not specifically mentioned but set forth in the findings of the trial court) the trial court correctly determined that overpayments based on error were properly collectible for the period within the statute of limitations, and that the board acted well within its powers in placing

these teachers prospectively in the rating they would have been in had the error not occurred.

*"Nine months rule" cases.*

The board contends that the teachers falling within this group should also be classified with the mechanical error cases. The solution of the problem here involved depends upon the proper interpretation to be given to a rule adopted by the board. If the employees of the board correctly interpreted this rule the ratings given these teachers were proper, and no error was committed. On the other hand, if the employees of the board misinterpreted the rule, then an error was committed and the cases should follow the same course as the other mechanical error cases.

The trial court found that the rule in question had no application to the teachers in this group. It therefore found that the ratings given these teachers by the employees of the board were correct—in other words, that no error had been committed. Accordingly, the trial court ruled that no overpayments had been made as to these teachers, that the board had no legal right to deduct any sum from their salaries, and that these teachers were entitled to a refund for all sums so deducted. The board appeals from this portion of the judgment. The trial court held, however, that the board had power to classify this group, for salary purposes, prospectively, and that it had properly re-rated these teachers in 1932. The teachers appeal from this portion of the judgment.

According to the findings there are twenty-five teachers in this group. They are all teachers who were in the department and who taught for part of a year and then took leaves of absence. The portion of the year that these teachers taught was less than nine months. The board had adopted certain rules on August 11, 1925, to guide it and its employees in the matters covered by the rules. These rules read as follows:

"CREDIT FOR TEACHING EXPERIENCE ELSEWHERE AND IN OTHER CLASSES OF SCHOOLS.

"Credit for teaching experience elsewhere and for teaching experience in other classes of schools may be graded for salary adjustment purposes as follow:

"(A) Teachers with less than three years of successful experience in teaching elsewhere, appointed to positions as

teachers in the San Francisco Public Schools, shall receive an annual salary provided for the first year of the Salary Schedule. Teachers with three years' experience shall receive the salary provided in the second year of the schedule; with four years' experience in the third year of the schedule; with five years' experience in the fourth year of the schedule; with six years' experience in the fifth year of the schedule; with seven years' experience in the sixth year of the schedule; with eight years of experience in the seventh year of the schedule; with nine years' experience in the eighth year; with ten years' experience in the ninth year; with eleven or more years of experience in the tenth year.

"(B) Elementary school teachers in the San Francisco School Department when assigned to teaching positions in the high schools shall receive credit for salary adjustment year for year for all teaching experience in the San Francisco Schools, but not to exceed the tenth year of the high school salary schedule. High schools as here used include the junior, part-time and high schools.

"(C) Teachers in the junior high school when assigned to the part-time school or the high school, and teachers in the part-time high school or assigned to the high school, shall receive credit year for year for teaching experience in the junior or in the part-time high school.

"(D) Credit on the basis of two years for one may be given for vocational experience in industry or in commerce to teachers of industrial or commercial branches when such industrial or commercial experience is directly related to the proper preparation for teaching in the respective industrial or commercial branches, provided that the total of such credit shall not entitle the teacher to a salary position higher than the tenth year of the schedule.

"(E) Evening school teachers, when assigned to duties as teachers in the day schools, shall be entitled to credit on a basis of two years' evening school teaching for one year on the salary schedule for day schools.

"(F) Not more than one year of credit shall be given for teaching experience during one year, and no credit shall be given for a term of service of less than nine months during one year.

"(G) Teachers asking for salary adjustments on account of teaching experience elsewhere must file with the Superin-

tendent satisfactory evidence of such experience in years and in months, and the places where such experience was obtained.''

The precise question presented is whether Rule F, *supra,* applied to teachers in the department who took leaves of absence, or whether it only applied to new entrants into the department, in rating their outside experience. The paymaster interpreted the rule to apply only to new entrants. Accordingly, as to the teachers on leave, when they returned, the paymaster advanced them one year in rating although they had not taught a full nine months in the year in which the leave was taken. The trial court agreed with this interpretation, holding that ''Rule F'' had no application to teachers on leave. It should be pointed out that all teachers similarly situated were so treated by the paymaster.

We agree with the interpretation of this rule given it by the trial court. In his second opinion Judge Goodell discussed this problem at some length. We agree with his analysis. We therefore adopt as part of the opinion of this court the following portions of the trial court's second opinion:

''In seeking the true intent and meaning of Rule F it is certainly proper to analyze the six rules in whose company it is found.

''A reading of Rule A shows that it can apply only to new teachers entering the San Francisco Department. In a word, it says that three years teaching experience here are as good as four elsewhere. This rule was referred to hundreds of times during the trial of these cases.

''Rule B, on the other hand, clearly refers exclusively to teachers already settled in the San Francisco Department (elementary) who are 'assigned' to either junior high, part-time high or high school proper.

''Rule C, following the principle announced in B, provides for the *assignment* from a junior high position to part-time high or high school proper, and from part-time high to high school proper.

''Rule D, again, relates only to new teachers entering the Department who have never taught before but who have had specialized training in the particular subject,—industrial or commercial,—which they are then engaged to teach.

''Rule E, dealing with teachers in evening schools who are

'assigned' to day schools, would seem to be designed for intra-department changes, as in Rules B and C, for the framers of the rule have used the word 'assigned' in E just as they did in B and C. It might also be held to relate to the rating of a newcomer for the very good reason that a newcomer should not enter the Department on more favorable terms than one already in the Department who is 'assigned' from one duty to another.

"Rule G clearly has to do with new teachers entering the Department. It is simply a procedural provision, auxiliary to Rules A and D.

"This brings us to a consideration of Rule F, which reads in its first part,—

" 'Not more than one year of credit shall be given for teaching during one year.'

"This part of the sentence would seem to be addressed to Rules A and D, for in the rating of new teachers the definition of what is a year's teaching would seem to be of paramount importance.

"The last nineteen words of the sentence, with which we are chiefly, if not entirely, concerned, are *'and no credit shall be given for a term of service of less than nine months during one year.'*

"This phrase, it seems to me, must likewise be addressed to Rules A and D. The two phrases which make up the sentence would seem, naturally, to be intended to clarify and define and make more definite, the *years of experience* with which Rule A deals,—to show, in other words, how those *years* should be computed.

"Granting, however, that the language of Rule F applies to B, C .and E as well, it does not by any means follow that it was intended to apply to cases such as the eighteen [later found to be twenty-five] now under consideration.

"In the first place, the very tenor of the resolution excludes such thought. Such idea is excluded even without resort to the title or heading of the resolution. It does not purport to deal with the measuring of a year, intra-department, as far as normal or ordinary advancement in the salary scale is concerned. It purports to deal only with cases of (a) new teachers entering· the Department with either teaching or vocational experience back of them and (b) Department

teachers shifted, 'assigned,' transferred, promoted, from one division of the Department to another.

"The ideas of leaves of absence, or sick leaves, or suspensions, are nowhere to be found from first to last. The idea of defining or measuring a year for the purpose of advancement from one year of salary status to the next above, is nowhere expressed, or implied.

"But, above and beyond what has been said, some meaning and weight must be given to the title or heading of the resolution reading as follows: 'Credit for teaching experience elsewhere and in other classes of schools.' This heading expresses two distinct ideas, but no more. And the introductory sentence repeats 'Credit for teaching experience elsewhere and for teaching experience in other classes of schools may be graded for salary adjustment purposes as follows:'

"When, therefore, Rule F says that 'no credit shall be given for a term of service of less than nine months during one year' does it not mean this, to paraphrase the heading: *In computing 'Credit for teaching experience elsewhere and in other classes of schools' within this Department 'no credit shall be given for a term of service of less than nine months during one year'?*

"Rule F, in other words, is cognate to the heading, and vice versa.

"In the construction of statutes where there is doubt or ambiguity, it is settled law in this State that resort may be had to the title and section headings. 23 Cal.Jur. sec. 145, p. 770; sec. 147, pp. 772-773. They are not conclusive by any means, but are legitimate aids in arriving at the legislative intent. It has been recently held that the headnote of a section of the Political Code 'may be considered part of the code itself, for purposes of interpretation.' (*Southlands Co.* v. *City of San Diego,* 211 Cal. 646 at 663 [297 P. 521].)

"If, then, headings may be considered part of statutory enactments themselves in seeking the true intent and meaning of the law, it would seem that in our search for the real intent of Rule F it is not only permissible but proper to read the heading as part and parcel of the rules themselves. When so read, there is little doubt in my mind that the Board intended these seven rules to apply to the two subjects mentioned in the heading, and to no others.

"No rule has been introduced in evidence bearing upon the subject of leaves of absence or the consequences thereof.

"As the record stands, then, the teachers in this group, when they returned from their leaves went along on the salary schedule and automatically advanced thereon from year to year the same as they would have advanced had they been teaching continuously. They were paid at the advanced rate. A new contract was made on the opening of each school year. Apparently it was the practice to treat teachers who went on leave in this way. There is no evidence to show (save in one or two isolated cases) that some teachers were thus treated while in the cases of others there was a coalescence of the year following their return with that of their absence.

 "I have no doubt that if such coalescence had been the settled practice the teachers could not have compelled the Board to advance them, for whether an employee is paid during an absence, or whether he shall be advanced in the line of seniority in spite of an absence, or retarded, or kept at a standstill, is all a matter between employer and employee, a matter purely of agreement or understanding between them. A nine months rule covering absences, such as counsel for defendants contend this is, would be a proper enough rule for the Board to adopt, but in the absence of such rule, and of any showing of discrimination it would seem that the advancement which the teachers automatically received should stand, in view of the fact that (as already noted) they were paid during the intervening years at the higher rate and their contracts therefore became executed contracts for those years. To go back and place them on a lower salary rate would amount to the making of new contracts retroactively after the commencement of the new school year." (Judge Goodell's second opinion is printed in Res. Br. pp. 132-194; part above quoted appears in Res. Br. pp. 165-171.)

 As already indicated the board, in 1932, determined that Rule F applied to teachers on leave, and accordingly the board deducted from the salaries of these teachers the amounts such teachers had been paid as a result of the alleged error of the paymaster in advancing these teachers in ratings for any year they had taught less than nine months. The trial court, as above pointed out, and for the reasons stated in its opinion above quoted, held that the paymaster had correctly interpreted the rule. It found "that said Rule F was not intended to apply, and did not and does not apply, to teachers who, by reason of leaves of absence, taught less

than nine months during any one year, but that said Rule F was intended to, and does, apply to the rating of teachers upon their original entrance into the Department. The Court finds, therefore, that said reductions and deductions were improperly made, and that said teachers are, and each of them is, entitled to recover back the amounts so deducted." We agree with this finding and the portions of the judgment based thereon. We find that the appeal of the board from the portions of the judgment based on the above finding is without merit, and that these portions of the judgment should be affirmed.

As already pointed out, the teachers in this group appeal from that portion of the judgment that denies them a writ of mandate on the ground that the board had the power to re-rate these teachers prospectively, commencing with the school year 1932-1933. The arguments advanced on this issue are identical with those advanced in the so-called "non-uniformity" cases, hereafter discussed. The question of the power of the board to re-rate prospectively is fully discussed in the portion of this opinion dealing with the "non-uniformity" cases. The portion of the judgment dealing with the question of the propriety of the prospective re-rating as to the teachers involved in the present group must be reversed for the reasons fully set forth in the discussion of the non-uniformity cases.

*Full time teacher rule.*

Six teachers are in this group. The problem here involved grows out of the proper interpretation of a resolution adopted by the board on June 16, 1925. So far as pertinent here that resolution reads:

"New Salary Schedule . . . Contingent upon Funds Being Provided from the State and Through the Local Tax Rate.

"Under the provisions of this Salary Schedule and of the rules governing the placing of teachers now in service upon the new Schedules, all full time teachers . . . will receive, during the next school year (1925-1926) an increase of not less than $360 above that which they received during the school year 1924-1925. . . ."

The question here involved depends upon the proper interpretation of the phrase "full time teachers" in the above

resolution. These six teachers had been employed as "substitutes," and were not formally employed as "probationers" until August 17, 1925, several months after the above resolution was adopted. The paymaster determined that these six teachers were "full time teachers" at the time the resolution was adopted (June 16, 1925) and therefore entitled to the "big raise," and entitled to be rated accordingly. The board, in 1932, determined that these six teachers were not "full time teachers" on June 16, 1925, because they were substitutes, were not entitled to be rated according to the above resolution, that the paymaster had made an error, and that the overpayments should be deducted from their salaries. The board also re-rated the teachers prospectively. The trial court, basing its holding solely on the ground that these teachers were substitutes, and reasoning that a substitute as a matter of law is not a full time teacher, agreed with the board, held that this was a case of mechanical or clerical error, and entered its judgment accordingly. The teachers appeal from the whole of the judgment insofar as it affects them.

It is conceded by all concerned on this appeal that the so-called "big raise" provided for in the above quoted resolution applied to probationers and regular teachers in the department on June 16 or July 1, 1925. In other words, it is conceded that probationers and regular teachers are "full time teachers" within the meaning of the resolution. It is equally apparent that one who is a substitute teacher, as that term is usually used, is not a full time teacher. Normally a substitute teacher is employed part-time on a per diem basis temporarily to replace a regular teacher who is absent, and normally a substitute teacher has no regular school assignment. The evidence shows that there were about fifty substitutes of this type employed by the department in the period in question. If the six teachers here involved had been substitutes of this type there would be no doubt that they were not full time teachers, and were therefore not entitled to the "big raise." But there are some unusual facts in relation to these teachers which demonstrate that these teachers were "full time teachers" as those terms are ordinarily used, and as they were used in the above resolution.

These teachers were employed under a resolution of the board of November 12, 1924. It provided:

"Resolved: That teachers appointed to positions in this department for the remaining portions of the current school year be appointed as substitute teachers at the salary to which they would be entitled as probationary teachers;

"And Further Resolved: That all such substitute teachers will be considered for classification as probationary teachers at the end of the present term."

Thus these teachers, although appointed "as substitute teachers," were paid as "probationary teachers," and at the end of the "present" term were to be "considered for classification as probationary teachers." Each of these teachers, unlike the usual substitute, was assigned to a particular school to fill a vacancy there existing. Each of these teachers, unlike the usual substitute, was paid a regular salary as if she were a probationary teacher. Each of these teachers, unlike the usual substitute, taught full time and continuously from the date of her appointment until the close of the 1924-1925 school year, at the school to which she had been assigned. Each of these teachers, unlike the usual substitute, received a pro rata vacation pay for the summer of 1925. These teachers were formally appointed probationers in August of 1925.

The evidence also shows that under the practice of the board then existing the superintendent of schools was empowered to appoint the usual substitute without consultation or formal action by the board. Probationers and other full time teachers were appointed by the board. These six teachers were appointed by resolution of the board. Moreover, the teachers in this group were subsequently made "permanent" teachers by board resolution. Miss Aebli, one of the teachers in this group, for example, was so appointed on May 13, 1927. Under the law and practice of the board at that time a teacher was classified as a probationer for two years before she was eligible to the rank of permanent teacher. This demonstrates that in 1927 the board, with the full facts before it, determined that Miss Aebli had been in fact a probationer since at least May 13, 1925, a month before the resolution of June 16, 1925, was adopted.

That the board intended to include teachers of the type here involved within the designation "full time teachers" is amply demonstrated by the testimony of Dr. Gwinn, superintendent of schools at the time the resolutions of November

12, 1924, and of June 16, 1925, were adopted. He testified that the vacancies of the type to which these teachers were appointed would normally have been filled by probationers, but that the members of the board were of the opinion that the department was growing too fast, and wanted to appoint substitutes instead of probationers so that they could be dis-. charged at any time if the need did not continue to exist. He also testified that the money for the ''big raise'' had been made available by the board of supervisors, and that that board wanted to give the ''big raise'' to all that were then in service. The board of education carefully framed the resolution of June 16, 1925, to accomplish that result. He also testified that it was his intent and his understanding of the intent of the board that so-called substitutes appointed in the spring of 1925 to ''open'' positions, and appointed probationers in the fall of 1925, were to be included within the June 16th resolution; that these teachers ''were in fact probationers but erroneously termed substitutes'' (Rep. Tr. 2008); that he believed ''that the intent of the rule'' was to include teachers of the type here involved as ''full time'' teachers; that the practice of giving to these teachers the ''big raise'' ''must have been with the knowledge of the Board and that that practice would confirm the interpretation that I have taken in this matter'' (Rep. Tr. 2012); that the terms ''full time'' were intended to include ''all substitutes who were still substitutes at the end of the 1924-1925 school term and came back as probationers in the following term,'' that is if they taught every day, ''that is what the expression 'full time' meant . . . and did not teach irregularly because of the irregular absences of teachers—I believe that it was the intent of the rule that those teachers should have the advantage of the extra raise, because the Board's resolution in November said that at some subsequent time the Board would give consideration to their classification'' (Rep. Tr. 2013); that he prepared the ''full time'' paragraph of the salary schedule; that the reason he did not expressly use the words ''substitute teachers who were later appointed probationers'' ''must have been . . . that I understood that the Board so interpreted the meaning of the rule. There was considerable discussion about the application of the salary schedule to individuals, as to whom—as to which ones had a right under the resolution to have that salary increase.'' (Rep. Tr. 2017.)

▆▆▆ It must not be overlooked that the phrase used by the board in the resolution of June 16, 1925, was "all full time teachers." The board did not use the phrase "permanent and probationary teachers" as it would have had it intended that the "big raise" should be limited to such teachers. Dr. Gwinn and the members of the board were thoroughly familiar with the proper designation of each class of teacher. They knew the differences between substitute and probationer, and full time teacher. The above testimony demonstrates that they used the phrase "full time" advisedly, and with intent to include those substitutes who were in fact full time teachers. It is not disputed that on June 16, 1925, each of these teachers was in fact a "full time" teacher in the sense that they were regularly assigned to a particular school to fill a regular vacancy. Their services were continuous in that capacity until the close of the spring term of 1925. They started the fall term of that year as probationers. In every sense of the word these teachers were "full time teachers," and in our opinion, clearly entitled to the so-called "big raise" of 1925. This being so, no error was committed by the employees of the board in so classifying these teachers. The board was not entitled, therefore, to deduct any alleged overpayments from their salaries. These teachers are entitled to a judgment for the amounts improperly deducted from their salaries. The judgment, insofar as it denies them this relief, must be reversed. The judgment also denies these teachers a writ of mandate on the ground that the board had the legal power to re-rate them prospectively. The arguments advanced on this issue are identical with those advanced in the so-called "non-uniformity" cases hereafter discussed. For the reasons there fully discussed the portion of the judgment denying the teachers in this group a writ of mandate must be reversed.

*The "non-uniformity" cases.*

This group includes some seventy-five teachers. The problems here involved differ fundamentally from the cases involving mechanical error. The latter cases all involved situations where the board had adopted certain rules and regulations, and the employees, in violation of those rules and regulations, gave the teachers involved an erroneous rating. The cases involved in the category now under discussion all deal with situations where the board itself, in the exercise of pow-

ers granted to it, rated the teachers. This group all involved the evaluation of the past experience of prospective teachers who had not theretofore taught in the San Francisco School Department. On the basis of past experience, teaching and vocational, a newly hired teacher was given a rating on the salary schedule. These ratings were made in the first instance by the employees of the board based upon information secured from the applicant and from other sources. The findings of the board's employees, together with all the facts, were then reported to a committee composed of three of the members of the board and known as the personnel committee. This committee then reported its findings and recommendations to the board. The board then would adopt a resolution fixing the rating that was to be given the applicant for her outside experience. As to all of the teachers in this group the trial court held that the board, acting within its powers and discretion, fixed these ratings when the teachers were hired, that no error had been committed, that the terms of the contracts of hiring were fixed by the board and accepted by the applicants, and that these contracts were valid. For these reasons the court held that the board was without power to reduce the ratings retroactively, and that the board was without power to deduct alleged overpayments from the salaries of these teachers. Accordingly, it granted these teachers judgment for the amounts improperly deducted from their respective salaries. The board appeals from this portion of the judgment. The court then held that, as to the future, the re-ratings of 1932 were valid. The theory of the trial court was that the board in 1932 could lawfully exercise its discretion on the same facts, could lawfully reach a different valuation of outside experience, and could lawfully offer the teacher a position and new contract based on the new valuation, and that, when accepted by the teacher, a binding contract arose. The court, therefore, denied these teachers a writ of mandate to be restored to their old ratings. The teachers appeal from this portion of the judgment.

As already pointed out, all of these cases involve the evaluation of outside experience, either teaching or vocational, of new entrants into the department. All concerned on these appeals admit that the board has power to determine the policy that should be adopted in reference to such evaluation. Thus the board could determine to evaluate each applicant's experience upon the facts of each case, giving con-

sideration not only to the actual number of years of such experience, but also to the nature of that experience, the applicant's personal attainments and abilities, etc. The board could likewise determine to adopt fixed rules that would apply to all or some cases regardless of the particular applicant's peculiar and unusual abilities, or it could determine to apply a mixture of these two policies. It had the power to determine whether any credit at all should be given for outside experience, or to determine, within the realm of reasonableness, whether credit should be given for certain types of experience and not for others. These are matters which rest within the discretion of the board. Of course, once a policy is adopted, the board must exercise its powers and apply the policy adopted fairly and without discrimination. The board undoubtedly has power, prospectively, to change its policies in this regard.

An examination of the evidence shows that at various times the board has adopted all of the various policies above mentioned in reference to evaluating outside experience. Prior to August of 1925 the board had no fixed and positive rules for evaluating such experience. The evidence shows that prior to that date the uniform practice of the board was to evaluate each teacher's rating according to the facts disclosed by her application, each case being weighed as to the particular facts. A substantial number of the teachers here involved entered the department while this policy was in effect.

In August of 1925 the board, acting well within its discretionary powers, determined to adopt certain rules by which outside experience was to be thereafter evaluated. These rules have been quoted, *supra,* in the discussion of the "nine month rule" cases and need not be repeated here. It will be noted that the policy adopted by the board in August, 1925, so far as that policy is disclosed by the rules, was to give to new entrants credit for "teaching elsewhere" for each year less one that they had taught elsewhere, with a maximum credit of ten years. (Rule A.) But under Rule D "credit on the basis of two years for one may be given for vocational experience in industry or commerce," when such experience was directly related to the industrial or commercial teaching position sought by the teacher, with a maximum credit of ten years. It will be at once noted that the above rules are limited to either teaching experience or vocational experience

in industry or commerce. Many of the teachers involved in this group, when they first applied for a position in San Francisco between 1925 and 1932 had had experience of a type not included within the categories provided by the rules. As to these, the board and its employees continued to apply the policy that had existed prior to August, 1925, that is to weigh each case on its particular facts. That was the uniform policy of the board during this period. Moreover, particularly as to vocational outside experience, the board did not rigidly apply the newly adopted rules to all cases. From the very first the board and its employees discovered that if the rules were rigidly applied they would be unable to secure as teachers many specially qualified persons that the board desired to employ. As a result, the board, from the very first, adopted the uniform practice of liberally construing its rules, of applying its rules to the normal cases, but where a particularly qualified teacher was specially desired for a special position, of weighing her particular qualifications, and rating her accordingly. In other words, between 1925 and 1932 the board adopted a policy partially based on the general rule doctrine and partially based on the individual qualification doctrine. Most of the teachers here involved were rated upon their entry into the department according to this policy.

In 1930 the outside experience rules of 1925 were modified in some respects, and in 1932 they were repealed entirely. Thereafter, as to new entrants, the board, acting within its powers, determined to grant no credit at all for outside experience.

When Owensby, in 1932, came to consider the teachers in this group he determined that in his opinion these teachers had been given too high a rating because of an error in application of the rules. In other words, even as to the group hired before August, 1925, to whom the rules then adopted clearly had no application at all, he determined that under the rules of August, 1925, rigidly and strictly applied, these teachers had been given too high a rating through an error, no different in substance from the mechanical error cases heretofore discussed. Accordingly, he recommended to the board, and the board adopted his recommendation, that all these teachers should be re-rated downward both prospectively, and retroactively for a two-year period.

The trial court found, in effect, that no error had been

made in originally rating these teachers—that the board in fixing their original ratings acted within its powers, and that as each teacher advanced in rating a valid contract was entered into with that teacher. It was held that inasmuch as there was no error, fraud, or mistake, the board could not redraft completed contracts and attempt to recover alleged overpayments for those years of work that were completed. The exact finding of the trial court on this issue is as follows (Finding 31): "The Court finds that the action of said Board in 1932 in reducing and re-rating said seventy-five teachers was not legal for the reason that said teachers had been given their standing in the first instance, not because of clerical error or inadvertence, but in the exercise of discretion and judgment, and however erroneous said judgments may have appeared to be to the Board as it was constituted in 1932, said conclusions had nevertheless formed the basis for the contracts between said teachers and said Department for all the school years from their entry into the Department to and including 1931-1932, and to then attempt such salary reductions retroactively would be, in legal effect, to attempt to make new contracts after the commencement of the several school years within said intervening period. Accordingly the Court finds that each of said seventy-five teachers is entitled to recover back from said City and County the amounts so charged back, which amounts are set opposite their respective names in finding 29."

We are in hearty accord with this holding. The reasons for this holding were fully and ably stated by the trial judge in his two opinions. We therefore adopt as part of our opinion the following portions of these opinions:

"Each of them involved the exercise of judgment and discretion by an officer of the department in the first instance and by the Board of Education ultimately. Such judgment and discretion were, however, subject to, and governed by the rules adopted in 1925 which rules were designed to insure uniformity. In going over a teacher's history and experience certain credits would be given by one officer, upon which there might be a difference of opinion if the rating were being carried on by somebody else. The fact remains, however, that the particular teacher was employed in a definite class or group, so far as salary schedule was concerned, at a definite salary rate. And each year as such teacher automati-

cally advanced into the next higher bracket a new contract was made according to the new rate. And so it went until 1932, when the Board, composed of somewhat different personnel, concluded that the uniformity rules had been in some cases disregarded or violated and new ratings were made. A distinction must be kept in mind throughout this discussion between mechanical or clerical errors in rating and errors arising from the exercise of judgment and discretion. In the former case you have a mistake pure and simple, and the teacher who benefits by the mistake knows, or should know, that it is a mistake and that she is getting more than she is entitled to, and that, sooner or later, she will probably have to pay back the overplus. On the other hand where facts have been weighed and a judgment arrived at (even though the judgment may be erroneous) there has been a definite meeting of minds between the department and the teacher, and a good contract has been made.

"When, therefore, in 1932 the teacher was charged back with the difference between what she was being paid and what the Board *in 1932* thought she ought to have been paid, the net result was to make (or attempt to make) a new contract with her, at a reduced salary rate, for the two years which had just elapsed, and to do so, of course, after two school years had opened."

After discussing the facts relating to several of the teachers, the trial court discussed at length the holdings in *Fidler* v. *Board of Trustees,* 112 Cal.App. 296 [296 P. 912], and *Abraham* v. *Sims,* 2 Cal.2d 698 [42 P.2d 1029]. It concluded its discussion of these cases as follows:

"What principles are to be gleaned from the two cases just discussed?

"*First:* That a teacher's status is that of an employee, the employer being the School Board; the relationship between the teacher and the Board is a relationship arising out of contract;

"*Second:* That under the law of California the School Board has a right, acting in good faith and in the exercise of a sound discretion, to reduce the salary of a teacher, notwithstanding the permanency of the teacher's tenure;

"*Third:* That such a reduction cannot be made after the beginning of a school year.

"How do these principles bear upon the non-uniformity cases now under submission?

''The City Attorney relies upon the following language found in Section 5.734 of the School Code. 'Uniform allowance may be made in any schedule of salaries for years of training and for years of service,' as establishing a principle of uniformity controlling upon all parties to this litigation. He argues from this that, when the teachers were rated in the first instance by the Department, they were not rated according to this uniformity rule, and that therefore the Board acted beyond its power (*ultra vires*) ; that when in 1932 action was taken re-rating the teachers and reducing them, the Board and its agents were simply doing what they should have done in the first instance, namely, acting according to the rule of uniformity laid down by section 5.734.

''There is no authority in this State which goes so far as to hold in line with this contention. Moreover, the fact must be faced that when the Board acted with respect to the rating of teachers in the first instance when they were employed the Board was acting, as 'an administrative agency created by statute' (*Grigsby* v. *King,* 202 Cal. 299, 304 [260 P. 789]) invested with the power and charged with the duty 'to fix and order paid the compensation of persons in public service requiring certification qualifications, employed by such boards . . .' (Section 5.731 School Code). In the fixing of this compensation the Board is enjoined by Section 5.734 to make 'Uniform allowance . . . in any schedule of salary for years of training and for years of service.'

''It certainly is not *ultra vires* for the Board to fix the compensation of new teachers, for section 5.731 expressly says that it shall have this very power and perform precisely this duty. But, counsel for defendants argue, they must exercise this power and perform this duty according to 5.734, i. e., according to uniform rules, and if they do not do so they are acting beyond their powers—*ultra vires*. In other words it is not what the Board does that is *ultra vires, but the way in which it does it.* Now in the rating of teachers the Board exercises its judgment and discretion. Presumably when the teachers were first rated the Board considered the rating as having been made uniformly. In 1932 when the same tribunal, but with somewhat different personnel, re-rated the teachers, the Board in the exercise of its judgment, decided that the first rating had not been uniform. In other words, the same tribunal decided that its own acts of several

years before had been *ultra vires* and should be upset, notwithstanding the contracts resulting from the original rating had become executed contracts.

"At the time when teacher X was employed and a deputy superintendent or other authorized officer of the Board told her that she would be employed as a third year teacher at a salary of $1584 a year, a contract was made between the Board and Miss X for that year at that rate. At the commencement of the next school year, when she went automatically to $1680, a new contract was made between the Department and herself, and so on, at the new rate for each succeeding year.

"The California cases to which reference has been made hold that the Board has the power, in the exercise of a sound discretion and acting in good faith, to reduce a school teacher's salary, but that such reduction cannot be made at any time after the opening of the school year (July 1st) when the Board has made a contract with the teacher at a fixed and given rate of salary. It seems to me to follow from these principles that when, in 1932, teacher X was notified that she had been reduced from eleventh year position of $2364 to tenth year position at $2208 and was billed by the Board for the difference in salary between the higher rating and the lower for the two-year period next preceding the re-rating, the net logical result was to retroactively reduce her salary after the school year, and in some cases several school years, had commenced, in violation of the rule laid down in the Fidler and Abraham cases.

"The teachers were not only charged back at that time with the difference accruing within the two-year period, but they were notified that their salaries for May and June of 1932 would be at the lower, rather than at the higher rate, thereby bringing home to the teacher notice of the change in salary rate after the opening of the school year. From what has just been said it naturally follows that, in my opinion, the charging back to the teachers in the non-uniformity cases (and I am not referring to cases of mechanical errors at all) was not warranted for the reason that it served, in substance and effect and for all practical purposes, to reduce the teacher's salary after the school years in question had opened."

The trial judge reaffirmed this holding in his second supplementary opinion. In doing so he gave the following example:

."Miss X in 1926 applied to the Department for a position. She truthfully stated what her educational qualifications and teaching experience had been, and it may be that she had had some office experience and training as well, or had done tutoring, or had taught in a private school. It might be remarked, parenthetically, that there are virtually as many varieties of experience shown in this record as there are teachers. The deputy who interviewed this teacher, after hearing her story, decided, in the exercise of his judgment and discretion, that she should be placed on the fifth year of the salary schedule, and she entered the Department and was paid for that year at that rate. In 1927 she advanced automatically to the sixth year rate, in 1928 to the seventh, and so on until 1931 when she would be, of course, in the tenth year. In 1932, when the re-rating was carried on, her case,—along with scores of others,—was re-examined and reviewed in the light of the rules of the Board which had been adopted before she entered. It was then determined by the Board that in 1926 she had been over-rated by, let us say, two years,—in other words, that the rules which had been designed and adopted for uniformly valuing and weighing teaching experience had not been followed,—and that she should then, in the interest of uniformity, be reduced by the same two years. Accordingly, teacher X found herself in the school year commencing July 1, 1932, on the ninth year of the salary schedule instead of on the eleventh. . . . Notices of these reductions in rating and deductions in pay were sent to the teachers before the *opening of the new school year July 1, 1932-June 30, 1933*.

"It was held in the first decision, upon the authority of the cases of our California courts therein cited, that separate contracts had been made on July 1st of each of the school years from 1926 to 1931 inclusive, at the higher rate, and that when the Board in 1932 attempted to lower that rate it was attempting retroactively to make new contracts,—*after the respective school years had opened*. It follows from this, for the reasons already given, that if this Court had been convinced that the Board in 1926 had in certain cases departed from its own rules, the Board had, nevertheless, exercised its own discretion in the matter and that discretion could not be disturbed by Court action.''

For the reasons given by the trial court it is clear that this portion of the judgment should be affirmed.

But the trial court held that the board, acting under its undoubted power to fix salaries, which includes the power, in a proper case, to lower as well as to raise salaries of teachers with permanent status, had the power to classify these seventy-five teachers for salary purposes, and, as to the future, offer the teachers a contract at the lower salary. The finding of the trial court on this issue is as follows (Finding 32):

"The Court finds that said notices sent to said seventy-five teachers (with the exception of the six teachers whose cases are discussed in finding 33) in May and June, 1932, and received by them before July 1, 1932, notifying said teachers of said reductions in ratings and salaries was sufficient as, and constituted, an offer of a new contract for the school year 1932-1933 and that it was within the right, power, authority and jurisdiction of said Board to reduce the salaries of said teachers (with the exception of said six teachers discussed in finding 33) for the future and prospectively as long as said reductions were made (as these were) before the commencement of the new school year, and were made fairly and not arbitrarily or capriciously. In this connection the Court finds that the purpose of the Board in reducing said seventy-five teachers (with the exception of said six teachers discussed in finding 33) commencing July 1, 1932, for the future, was to effect uniformity and fairness in ratings within the Department and to remove what had, in the opinion of said Board [in 1932], given said seventy-five teachers (with the exceptions last noted) an unfair advantage over other teachers in said Department, and that said action was neither arbitrary nor capricious. Accordingly the Court finds that none of said seventy-five teachers named in finding 29 (with the exceptions last noted) is entitled to any mandate or order of this Court directing the restoration of said teachers to the status which they had theretofore occupied on said salary schedule, or to any money judgment for salary after July 1, 1932, over or above what they have been paid since July 1, 1932."

We do not agree with this holding and are of the opinion that the portion of the judgment based thereon must be reversed.

The real question presented is whether the board in 1932 had power to review the service status ratings of these teach-

ers years after the ratings were given, in cases where the original ratings were not based on fraud, error, or mistake, and were valid when given, and to re-rate and classify, for salary purposes, a group of teachers solely because the board as it existed in 1932, believed the original ratings were too high. In our opinion such a classification has no reasonable basis, is unreasonable and arbitrary, and was beyond the power of the board.

 There can be no doubt but that the board possesses the power to reduce salaries at the commencement of a school year, even of permanent employees with tenure, provided that there is a reasonable basis for such a reduction and provided the reduction is not the result of an unreasonable, arbitrary, or capricious act. (*Cleeves* v. *Board of Education,* 22 Cal.App.2d 183 [70 P.2d 645]; *Fidler* v. *Board of Trustees,* 112 Cal.App. 296 [296 P. 912]; *Abraham* v. *Sims,* 2 Cal. 2d 698 [42 P.2d 1029]; Annotations 110 A.L.R. 800; 113 A.L.R. 1495; 127 A.L.R. 1298.) But this power is not unlimited. The board has no power to discriminate against any teacher. It cannot pick out some teachers in a particular category, and without a change in duties or functions, classify that group for salary purposes different from others in the same category (*Fry* v. *Board of Education,* 17 Cal.2d 753 [112 P.2d 229]), nor can it reduce salaries in an arbitrary, capricious, or unreasonable manner. (*Kacsur* v. *Board of Trustees,* 18 Cal.2d 586 [116 P.2d 593].)

In the present case the board attempted to re-rate these teachers in 1932 because it was represented to it, and it believed, that an error had been committed when these teachers were originally rated. The board, as it was then constituted, believed that the board, as it was constituted between 1925 and 1932, had committed an error, no different in substance from the mechanical error cases above discussed. The trial court has properly held that, in originally rating these teachers, the board acted within its powers, and that no legal error was in fact committed. Thus the entire basis upon which the board purported to act in 1932 is found not to exist. The board purported to be correcting what it believed in 1932 was an error of an earlier board. When it is held that no error was in fact committed, the foundation of the board's classification is destroyed. Although the attempt of the board to classify these seventy-five teachers was thus based on a

fundamental misapprehension of the true facts and the law applicable to them, nevertheless the board now claims its classification should be upheld. The fallacy in the board's position is demonstrated when we consider just what was done in 1932. At that time the board purported to review the facts in each case, concluded that, in its opinion, the 1925 rules had been misinterpreted or misapplied in each case, determined that the original rating had been too high, and thereupon re-rated the teacher downward, both prospectively and retroactively, to the rating the board in 1932 determined the teacher should have been given upon entering the department. A few examples will show how this operated. Marjorie Cushman was appointed, on June 23, 1925, as a probationer for the school year 1925-1926, effective July 1, 1925, with an eighth year rating. She had seven years outside creditable teaching experience. She was given full credit for this outside experience. This was undoubtedly a correct rating under the uniform policy of the board as it then existed. In 1932 the board determined that under the August, 1925, rules, this teacher should have been originally placed on the sixth instead of eighth rating, and for that reason re-rated her prospectively downward. Thus the board in 1932, by erroneously applying the August, 1925, rules to this teacher, when those rules were not in existence when she was employed, and thus had no application to her, reclassified her, for salary purposes, for a completely erroneous and improper reason. This same reasoning applies to all teachers employed prior to August of 1925.

Another example illustrates as to how the re-rating of 1932 applied to those teachers employed subsequent to August, 1925. Lois Woods was appointed a probationer in the department of texts and libraries on maximum tenth year rating in 1928. At that time this teacher had more than eleven years' experience as librarian in various public and school libraries. The 1925 rules are silent as to how such experience should be classified. Obviously this teacher had neither outside teaching experience nor outside experience in "industry and commerce." That was all the 1925 rules purported to cover. The board, considering her case separately, as was then its policy, determined to give her credit for her library experience as if it were outside teaching experience. Accordingly, it gave her a tenth year rating. The board undoubtedly acted within its powers and discretion in

so rating this teacher. There is obviously a difference between experience in industry and commerce which is only related to the teaching position that the applicant desires, and outside experience identical with that to be performed for the department. This rating then, when made in 1928, and up until 1932, was legally binding on the board. In 1932 the board determined, erroneously, that the board in 1928 had committed an error in rating her at tenth year status, and held that the library work should have been credited as vocational experience. It therefore determined that this teacher should have come into the department in 1928 at fifth rating instead of tenth, and, accordingly in 1932, purported to reduce her from twelfth to seventh rating, at a salary reduction of over $600 per year. This same situation exists as to the large group included within this category where the 1925 rules did not apply to their type of outside experience. Other examples could be given of the many cases in which the board between 1925 and 1932 liberally construed its 1925 rules and rated a teacher accordingly, and then in 1932 the board strictly construed its rules and purported to re-rate a teacher downward.

The same general situation existed as to all those within the "non-uniformity" category. The board in 1932, based upon the theory that the original rating was erroneous and in violation of the rules, purported to reduce these teachers in accordance with what it erroneously thought the rules required. The trial court has held, and, we think correctly, that the original ratings were within the power of the board and binding upon it. For that reason it held that the board had improperly attempted to apply its re-rating retroactively. Once this is determined, the entire basis of the board's re-rating falls, and the arbitrary character of the re-rating becomes apparent. Thus, if a teacher, such as Lois Woods, was properly given tenth year rating in 1928, and if for the school year 1931-1932 she was properly given twelfth year rating, how can she be classified properly seventh year rating for 1932-1933? What the action of the board amounts to is that prior to the beginning of the school year 1932-1933 it determined that all teachers properly classified in the twelfth year rating for the year 1931-1932 should be "frozen" in that status for the year 1932-1933. But as to Miss Woods, and the others similarly situated, the board determined that they should be classified as seventh year rating, solely because

the board felt, erroneously, that an error had been committed in 1928. Thus the board is seeking to uphold a classification based upon an erroneous premise, and one which singles out certain teachers for salary purposes, and seeks to classify them differently from all others in their status group. All others in twelfth status remained in that status. A few, including Lois Woods and those similarly situated, were reduced in rating, without any change in duties, functions, or hours of service.

The board says, and the trial court found, that this was done in a good faith attempt to accomplish "uniformity." Just what is meant by that is not entirely clear. Uniformity with what? The law vests the board with the power to determine policy. As already pointed out, at various times the board has adopted different policies in reference to evaluating outside experience. Obviously, any time there is a change of policy, it creates a lack of uniformity in the sense that teachers who become members of the department while one policy is in effect are treated differently from teachers who become members of the department while a new policy is in effect. Such lack of "uniformity" is inevitable as a school board progresses with the needs of various periods and accordingly changes its policy. The board in 1932 was not attempting to secure overall uniformity as to ratings based on outside experience. In that very year the board repealed the 1925 rules and determined that as to all new entrants in the department no credit at all should be given for outside experience. Thus at the very time that the board now claims it was attempting to secure overall uniformity by strictly applying the 1925 rules to all teachers, regardless of when they were first employed, it was making overall uniformity impossible by changing its entire policy as to evaluation of outside experience.

If the position now taken by the board is correct, it would mean that at the beginning of any school year since 1932-1933 the board, purporting to be exercising its powers over salaries, and in an endeavor to secure "uniformity," could have determined that every teacher in the department should not have been given any credit at all for outside experience (in accordance with its existing policy), and that every teacher in the department should have her service status rating reduced accordingly for the future. That is what the board would have to do did it desire to secure absolute "uniformity." If a school board could thus change the service

758

status rating of those already in the department every time the personnel of the board happened to change, or every time the members of the board determined to change policy, the teachers would have no security at all in their employment and in their seniority rights. There can be no doubt but that the board could impose a horizontal salary cut on all those within certain ratings. This was done by the several resolutions that "froze" the salaries of certain teachers for certain years. But the teachers are protected against any arbitrary reduction in rank or rating. ■ When the board has once adopted a policy and, without fraud, error or mistake, rates a teacher under that policy, although the board may change its policy as to new entrants into the department, it has no power years later to go back and review that teacher's case, and to re-rate that teacher prospectively, on the theory that the original rating was too high. The board having once acted lawfully in rating a teacher has exhausted its power over that subject matter.

The theory of the trial court, as disclosed in the findings above quoted, and as disclosed in that portion of the trial court's opinion quoted in the dissent, was that the board, prior to the beginning of a school year, has the power to offer any teacher a contract at any salary, and if the teacher accepts by continuing to teach, a valid contract comes into existence. For this reason the trial court was of the opinion that the reclassification of 1932 was not arbitrary or capricious, and was made in good faith.

It should be noted that the trial court's opinion was prepared before the dates of the decisions of the Supreme Court in *Fry* v. *Board of Education,* 17 Cal.2d 753 [112 P.2d 229] and *Kacsur* v. *Board of Trustees,* 18 Cal.2d 586 [116 P.2d 593]. The Fry case, by necessary implication, and the Kacsur case, by express ruling, held that the board did not have unlimited power to offer reduced salaries to permanent teachers, which offer, if the teacher continued to teach, became a valid contract. The holding of the Kacsur case is directly opposed to the theory of the trial court in the instant cases. In the Kacsur case the board, in May, 1938, offered two permanent teachers new contracts at reduced salaries for the school year commencing July 1, 1938. The teachers, as did the teachers in the instant cases, protested, but did perform their assigned duties for the school year 1938-1939. The board in that case made the contention that a valid contract had come into exis-

tence—the exact holding of the trial court in the instant cases. It was urged that the amount of a particular teacher's salary was a matter of contract, and that it was improper for the teacher to refer to her former salary or the salary of others in the department in an attempt to show that the offered salary was discriminatory. The Supreme Court, after recognizing the general rule that the board may fix salaries, stated (p. 592): "However, there are limitations on the power of boards of trustees to change salaries of permanent teachers. One of the 'legal consequences' referred to in the Abraham case, *supra,* is that the fixing of salaries must not be discriminatory, arbitrary or unreasonable. The above cited cases all so qualify the general power of the administrative agencies to fix the salaries of permanent teachers. Because of this qualification it necessarily follows that there must be a comparison with the salaries of other teachers or salaries of previous years. If this could not be done, the qualification would be meaningless."

The Supreme Court then held that the board had attempted to classify these two teachers, for salary purposes, differently from others similarly situated and had attempted to reduce the salary of these teachers below the level paid others in the same category. This, it was held, as a matter of law, was discriminatory, and the decision of the trial court to the contrary, reversed.

The situation, in the instant cases, is similar to that existing in the Kacsur case. ▉▉▉ Owensby, in 1932, studied individually the cases of these 75 teachers. As to each of them he determined that some error had been made in classifying these teachers when they first entered the department—that some existing rule had been violated. He so informed the board, and the board, acting on this representation, and believing in good faith that such errors had been committed, purported to reclassify each teacher prospectively and retroactively. The trial court held, and we are affirming that part of the judgment, that no error had been committed—that these teachers were all validly rated when they entered the department. But it was only if an error had been committed that the board would have had power to reclassify these teachers (without a change in duties and functions) differently from other teachers in their service status group. What the trial court did was to say that although no error was committed in the original classification of these teachers, the board had power to offer a lower salary to these teachers than

that offered other teachers in their same category. As a matter of law, for the reasons fully stated in the Kacsur and Fry cases, *supra,* such classification was arbitrary and capricious, and unreasonable.

It should be pointed out that no changes in duties or functions or hours of work were involved in the reclassification of 1932. Teachers in a particular service status rating continued to perform the same duties and functions, and work the same hours, as all others in that rating, but were reduced to a lower rating for the reasons above pointed out.

 Some significance must be given the service status rating of a teacher. Seniority rights in the department depend upon that rating. A teacher may not be subjected to being divested of those rights every time a new policy is adopted by the board.

For these reasons, the classification, prospectively, of the teachers in this group in 1932 must be held to have been invalid, and the portion of the judgment based thereon must be reversed.

There are several cases in which the trial court held that the board could not re-rate the teachers either retroactively or prospectively. The court held that as to these cases, because of facts peculiar to each case, the board was estopped from re-rating the teachers involved. We do not find it necessary to pass on the propriety of the trial court's holding insofar as it is based on estoppel. These cases, in any event, fall within the "non-uniformity" group above discussed. The holding as to these teachers will follow the holdings made as to that category. This means the judgment as to them should be affirmed.

This disposes of all of the major problems involved on these appeals. From what has been said it follows that all portions of the judgment from which the board appeals should be affirmed. So far as the appeal by the teachers is concerned, all portions of the judgment from which they appeal should be affirmed except the following:

(a) That portion of the judgment denying to the teachers discussed under the heading "Nine months rule" cases a writ of mandate to be restored to their prior ratings should be reversed.

(b) That portion of the judgment denying to the teachers discussed under the heading "Full time teacher rule" the right to recover the amounts deducted from their salaries,

and a writ of mandate to be restored to their prior ratings, should be reversed.

(c) That portion of the judgment denying to the teachers discussed under the heading "The 'non-uniformity' cases" the right to a writ of mandate to be restored to their prior ratings should be reversed.

It is so ordered; the teachers to recover their costs on the appeal by the board; each side to bear its or their own costs on the appeal by the teachers.

Ward, J., concurred.

KNIGHT, J., Concurring and Dissenting.—It is my conclusion that the trial court's decision herein should be sustained in all particulars. I therefore dissent from those portions of the majority opinion which direct a reversal as to the three groups of teachers therein specified.

As will be noted, the principal point on which the majority opinion disagrees with the trial court's decision relates to the validity of the 1932 re-rating by the school board insofar as its prospective operation affects the three groups of teachers included in the order of reversal, and which are referred to throughout the record as the "non-uniformity" cases.

At the time this controversy arose, there were approximately three thousand teachers employed in the San Francisco School Department, and it appears from the record that for a number of years prior to 1932, for one reason or another, the 189 teachers whose status is involved in these consolidated actions had been given higher salary ratings than other teachers with the same experience, both outside and inside of the San Francisco School Department, and in the same group classifications. This condition finally brought about an investigation and audit of the entire teaching department. It consumed several months, and was made by Wilbur S. Owensby. Thereafter, and in 1932, the school board adopted his report and recommendations, re-rated the 189 teachers, and readjusted their salaries accordingly. The board claimed that these reduced ratings operated retroactively as well as prospectively. As to the "non-uniformity" cases the trial court held that the 1932 re-rating did not operate retroactively, but did operate prospectively, and in so holding found as a fact that the 1932 re-rating was made in good faith, that it was not discriminatory, arbritary, or

capricious, and was free from any fraud. The majority opinion repudiates the trial court's finding, and on the same facts holds that the re-rating has "no reasonable basis, is unreasonable and arbitrary, and was beyond the power of the Board." In my opinion the record fully sustains the trial court's finding.

The trial spread over a year, and in deciding the controversy the trial judge filed two written opinions, wherein he reviewed and discussed the facts and the law elaborately and with great care. The two opinions are set forth in the brief filed by the board of education, and cover some 125 printed pages thereof. With respect to the question as to whether the 1932 re-rating was unreasonable and arbitrary the judge said in part:

"In connection with this subject, the only question that remains is whether or not in the re-rating in 1932 the Board acted in good faith and in the exercise of a sound discretion. I am prepared to make a finding of fact that when the re-rating was done in 1932 the Board and its officers and employees acted in the exercise of a sound discretion, in good faith, without any discrimination in favor of or against any teacher or teachers, but, in fact, in a bona fide attempt to equalize and level off the salary status of all the teachers in the department.

"The investigation and auditing work which led to the re-rating had taken a long time and was conducted by Mr. Wilbur S. Owensby, who was the principal witness in this litigation. Mr. Owensby testified in each one of the cases and he showed that he had a detailed and thorough grasp of each individual case. He testified in each case as to the reason for the re-ratings; he was subjected to cross-examination, and the court had every opportunity to determine whether or not he was informed as to his subject and whether or not he was judicial and impartial in his attitude. The cases took many days for trial, spread over a period of approximately a year, and during the entire time there was nothing in the attitude of Mr. Owensby or of anybody who testified on behalf of the defense to indicate anything but the highest good faith, sincerity, impartiality, and a desire to give each teacher exactly what was coming to him or her, nothing more and nothing less. There may be a wide difference of opinion as to whether or not the investigation in 1932 and the re-rating

consequent thereon was necessary or justified. There undoubtedly *is* a wide difference of opinion with respect to the propriety or impropriety of the original ratings of a number of teachers whose cases are before the court. There is an honest difference of opinion, no doubt. But those differences of opinion based upon the judgment of the officers who did the rating and/or re-rating are matters which might arise within any board or tribunal at any time, and under the authorities a court cannot substitute its judgment for theirs. The court in this case is concerned solely with whether or not the reductions were made in good faith and not in any arbitrary or capricious manner or with a view to discriminating in favor of any teacher or teachers or against any. The re-rating was undertaken, and, in my opinion, carried out under a fixed determination to level off, as far as humanly possible to do so, the teachers involved in this litigation with other teachers in the department who occupied less favorable status, and throughout the entire course of the trial there was nothing in the attitude or demeanor of Mr. Owensby or any other defense witness or in the great volume of testimony and the mass of documentary evidence to indicate any unfairness, favoritism, arbitrariness or bad faith whatsoever. Mr. Owensby was as consistent, logical and fair in his handling and grouping of the different cases as he was accurate in his computations and figures. And so far as I can remember, counsel for the plaintiffs at no time challenged his good faith or impartiality. It is true that counsel for plaintiffs in presenting his cases and in representing his clients took decided issue with the re-rating as a matter of principle, contending that the board was bound by the ratings given in the first instance, but there was no claim of bad faith, favoritism or partiality in the process of re-rating. The case presented from the outset, and now presents, two conflicting and diametrically opposite theories,—the plaintiffs' being that a rating once made must stand, the defendants' that a rating not 'uniform' under section 5.734 results in an *ultra vires* contract which is not binding upon the board. What was done by Mr. Owensby was then submitted to the constituted authorities of the board of education and his action became their action, and the re-rating was done officially as a matter of board action. The re-rating was done by the board in the carrying out of a policy already discussed, a policy which, in the judgment of the board, was proper in view of the fact

that the advanced ratings given to the teachers resulted in teachers being given positions which, in the judgment of the board, gave them preferences and advantages over other teachers similarly situated.

"For these reasons I am prepared, as already indicated, to make a finding that the Board acted in good faith in 1932 when it reduced the salaries *commencing with July 1, 1932.*"

In conformity with the views thus expressed, the trial judge entered a finding to the effect that the re-rating and salary reductions "were made fairly and not arbitrarily or capriciously."

As supporting the opposite conclusion and by way of examples the majority opinion selects two individual cases from those of the large number of teachers involved, and after commenting on those two cases the opinion goes on to say: "Other examples could be given of the many cases in which the Board between 1925 and 1932 liberally construed its 1925 rules and rated a teacher accordingly, and then in 1932 the Board strictly construed its rules and purported to re-rate a teacher downward." This is obviously contrary to the view of the trial judge; but to attempt to set forth in this opinion all of the facts and circumstances revealed by the record which may be taken as sustaining the trial court's view would result in an interminable task; furthermore, it would seem to be unnecessary to do so in view of the well settled rules governing reviewing courts in dealing with challenged findings of fact. It seems to me that a fair analysis of the facts as they are set forth and discussed in the trial court's opinion will demonstrate that all that was sought to be done by the re-rating was to place the teachers involved in the "non-uniformity" groups on an equal, uniform basis with the other teachers, and pay them accordingly. In other words, it would appear that the other teachers in the department were the ones discriminated against by the ratings given appellants prior to the 1932 re-rating; and the trial court in effect so found. In part the finding reads: "In this connection the Court finds that the purpose of the Board in reducing said seventy-five teachers (with the exception of said six teachers discussed in finding 33) commencing July 1, 1932, for the future, was to effect uniformity and fairness in ratings within the Department and to remove what had, in the opinion of said Board [in 1932], given said seventy-five teachers (with the exceptions last noted) an un-

fair advantage over other teachers in said Department, and that said action was neither arbitrary nor capricious."

It is stated in the majority opinion that ". . . the Board attempted to re-rate these teachers in 1932 because it was represented to it, and it believed, that an error had been committed when these teachers were originally rated"; whereas the trial court found that the previous ratings were the result of a proper exercise of the board's power; and it seems to be argued that in that state of the case the 1932 re-rating is shown to be unreasonable and capricious as a matter of law. The real question the trial court was called upon to determine, however, was whether in fact the 1932 re-rating was unreasonable or arbitrary; and since there are facts shown by the record tending to support the negative finding made by the trial court to that effect, this court, under well settled rules, should sustain the finding, regardless of whatever belief may have been entertained by the board.

The majority opinion appears to go even further than holding that the 1932 re-rating was unreasonable and arbitrary, by declaring the law to be that when a board has once adopted a policy, and without fraud, error or mistake rates a group of teachers under that policy, although the board may change its policy as to new entrants into the department, it has no power some years later to re-rate those teachers prospectively "on the theory that the original rating was too high"; that "The Board having once acted lawfully in rating a teacher has exhausted its power over that subject matter." This view would seem to be somewhat at variance with those expressed in the forepart of the opinion, wherein it is stated that the board has full power to evaluate each applicant's experience upon the facts of each case, giving consideration not only to the number of years of such experience, but to the nature of that experience, and the applicant's personal attainments and abilities; likewise to adopt fixed rules that would apply "to all or some cases" regardless of the particular applicant's peculiar and unusual abilities; or it could apply a mixture of those two policies; and the opinion then goes on to say: "These are matters which rest within the discretion of the Board. Of course, once a policy is adopted, the Board must exercise its powers and apply the policy adopted fairly and without discrimination. *The Board undoubtedly has power, prospectively, to change its policies in this regard.*" (Italics added.)

However, as shown, the majority opinion goes on to hold that unless it appears that the original ratings are based on fraud, error or mistake, the board has no power thereafter, upon finding that its original ratings are inequitable, unfair, and in fact discriminatory, to re-rate and reclassify; and on that issue I agree with the trial court that in those circumstances the board has the power to re-rate so long of course as the re-rating and reclassification is made in good faith and is not unreasonable or arbitrary. In dealing with this feature of the case the trial court in its first opinion extensively discussed the cases of *Fidler* v. *Board of Trustees*, 112 Cal. App. 296 [296 P. 912], and *Abraham* v. *Sims*, 2 Cal.2d 698 [42 P.2d 1029], and then went on to say:

"What principles are to be gleaned from the two cases just discussed?

"*First:* that a teacher's status is that of an employee, the employer being the school board; the relationship between the teacher and the board is a relationship arising out of contract;

"*Second:* that under the law of California the school board has a right, acting in good faith and in the exercise of a sound discretion, to reduce the salary of a teacher, notwithstanding the permanency of the teacher's tenure;

"*Third:* that such a reduction cannot be made after the beginning of a school year."

Later on the court said:

"While I entertain the views just discussed with respect to the immunity of the teachers from a retroactive cut in their salaries after the opening of any school year, there is another feature of the case upon which I have equally decided views which will result in a denial of the petition for a writ of mandate to compel a restoration (upward to the salary rating or yearly status which they enjoyed before the cut).

"The prayer of the petition in each case is that the Board of Education be ordered to restore on the records and rolls of the School Department the respective teachers to the higher rating or status which they had held before the re-rating in 1932. With respect to this phase of the case a careful study of the case leaves me in no doubt at all that, while the Board of Education had no power to retroactively reduce the salaries which had been paid up to and including June 30, 1932, it had, under the authority of the California cases full power

and authority to put the teachers on a new salary basis for the future even though that resulted in a reduction. By reducing a teacher from a twelfth year standing of $2436 to tenth year standing of $2208 the Board naturally effected a reduction of the teacher's salary rate for the ensuing years, and until a further rating was made, for all years to come. Without repeating, it could do this, provided the reduction was made before July 1st, 1932.

"How did this reduction work out in actual practice? The notices were sent to the teachers in May or June of 1932 and conveyed to them in plain and unmistakable language the fact that the teacher's status, and therefore salary rating, had been reduced. While the notice was not sufficient to effect a retroactive reduction for past services, it *was* sufficient to notify the teacher that, commencing with the new school year on July 1, 1932, her salary would be, let us say, $2208 a year instead of $2436. With that notice in hand the teacher entered upon her regular duties when school opened in the summer of 1932. True, the teacher might have had mental reservations and entertained a sense of injustice at the reduction in her compensation, and a firm purpose about seeing a lawyer about it and possibly litigating as was ultimately done in these cases, but the fact remains that the teacher did not refuse the contract but signified her acceptance of it by continuing to teach during and after 1932, leaving it to subsequent litigation to determine whether she should continue to get or be restored to $2436 or whether her contract rate would be $2208. Had the teachers, or any of them, come to the school board and refused to go back to teaching at the reduced figure, the board would have been confronted with the alternative of giving the teacher what she asked for or of adhering to its ruling and refusing to pay her any more than the re-rated and reduced salary. It was a matter of contract, as the cases hold, and a new contract was entered into. But it cannot be said, in view of the notices sent out in May and June of 1932, that the new contract was for $2436 a year when the notice said that the compensation would be only $2208. The teacher by her action, resuming or continuing her duties, accepted the contract as tendered at the reduced rate, leaving it to be determined in the future whether or not she was entitled to the higher rate.

"There is no inconsistency between these holdings, the

Fidler and Abraham cases holding distinctly to the effect that salary reductions cannot be made during a school year, or after a school year has opened, but that reductions *can* be made *before* the opening of any school year. For these reasons it will follow that the petitions for writs of mandate compelling the Board of Education to restore the teachers to the higher status they had occupied before 1932 will be denied.''

The majority opinion seems to construe the foregoing portion of the trial court's decision as holding that the sole basis for its conclusion that the reclassification of 1932 was not arbitrary or capricious and was made in good faith was that prior to the beginning of the school year the teachers accepted contracts to teach at the reduced salary, and that therefore the trial court's decision in this respect conflicts with the decisions rendered in *Fry* v. *Board of Education,* 17 Cal.2d 753 [112 P.2d 229], and *Kacsur* v. *Board of Trustees,* 18 Cal.2d 586 [116 P.2d 593]. But it would appear that this is a misconstruction of the basis of the trial court's decision, for it is therein clearly stated: ''With respect to this phase of the case a careful study of the case leaves me in no doubt at all that, while the Board of Education had no power to retroactively reduce the salaries which had been paid up to and including June 30, 1932, *it had, under the authority of the California cases full power and authority to put the teachers on a new salary basis for the future even though that resulted in a reduction.''* (Italics added.)

The other portion of the majority opinion with which I am unable to agree is that portion reversing the trial court's decision relating to the cases falling within the ''full time teacher'' rule. The facts shown by the record in my opinion support the conclusion reached by the trial court. It appears therefrom, among other things, that the so-called ''big raise'' resolution of 1925 was adopted on June 16, 1925, and read as follows: ''Contingent upon funds being provided from the State and through local tax rate, under provisions of this salary schedule and under the rules governing the placing of teachers now in service upon the new schedule, all full time teachers, all principals, supervisors and assistant supervisors in the day schools, will receive during the next school year 1925-26, an increase of not less than $360 above that which they received during the school year 1924-1925, apart from

odd amounts added or subtracted in order to fit the teachers' salaries exactly into the new schedule." And in determining the status of the teachers embraced within this classification, the trial court said in part: "I am satisfied that the six teachers in this group were no more entitled to the 'big raise' in 1925 than were the other substitute teachers who did not receive it. In other words, as I see it, they were not, on June 16, 1925, 'in service' as 'full time teachers.' They were not given probationer status until August 17, 1925. The resolution reads that teachers are entitled to the $360 increase *above that which they received during the school year 1924-1925.'* This is another reason why the increase was not intended for substitutes paid one month at one rate, the next at another.

"These six cases will have to be treated as cases where by clerical error the teachers received an advance to which they were not entitled."

In referring to the previous resolution adopted by the board on November 1, 1924, upon which the reversal seems to be based, the trial court held in effect that said resolution did not alter the situation because it was adopted seven months before the "big raise" or "full time" resolution was adopted. It would seem to me, therefore, that in view of these facts the question of the status of this group of teachers was correctly disposed of by the trial court.

In conclusion it does not seem inappropriate to emphasize that the main issue as to whether the 1932 re-rating was or was not arbitrary and capricious involved a question of fact, and that being so was one, necessarily, for the determination of the trial court. A reading of the two opinions filed by the trial judge will at once disclose the scrupulous care taken by him in going through the lengthy record and assigning the individual teachers to their respective groups in accordance with the testimony; and I have found nothing in the record, or in the majority opinion, which in my judgment shows that any part of his decision is unfair in fact or unsound in law. Therefore in my opinion it should be sustained in all particulars.

Defendants and appellants' petition for a hearing by the Supreme Court was denied March 30, 1944. Shenk, J., and Schauer, J., voted for a hearing upon the ground that in their opinion the judgment should be affirmed in its entirety.