The People of the State of Illinois on the Relation of Joseph Cinquino, Plaintiff-Appellant, v. Board of Education of the City of Chicago, a Body Politic and Corporate, Benjamin C. Willis, General Superintendent of Schools and Member Ex Officio of the Board of Examiners of the Board of Education of the City of Chicago; William C. Reich and Richard H. Sanders, Members of the Board of Examiners of the Board of Education of the City of Chicago, Defendants-Appellees.

Board of Education of the City of Chicago, a Body Politic and Corporate, Counter-Plaintiff-Cross-Appellant, v. Joseph Cinquino, Counter-Defendant-Cross-Appellee.

Gen. No. 50,181.

First District, Fourth Division.

August 30, 1967.

Rehearing denied September 28, 1967.

John Ligtenberg and Harry A. Young, Jr., of Chicago (Harry A. Young, Jr., of counsel), for appellant.

James W. Coffey, of Chicago (John T. Mehigan, Michael J. Murray and Richard E. Girard, of counsel), for appellees.

MR. PRESIDING JUSTICE ENGLISH delivered the opinion of the court.

Plaintiff, a teacher employee of the defendant Board of Education, appeals from a judgment denying the prayer of his complaint for reinstatement to Lane IV of the Board's salary schedule and for salary payments for the periods (a) from the time of his original application for placement on Lane IV to the time of his placement thereon, and (b) from the time of his removal from Lane IV to the present. As error, plaintiff contends that the trial court should not have ruled inadmissible certain evidence offered by plaintiff showing that the Board had, in other cases, construed and applied its own rule so as to vitiate its defense to this action, and, further, that such evidence shows the removal of plaintiff from Lane IV to have been arbitrary and discriminatory.

■■■■■■■■■■■■■■■■■■■■

Effective January 1, 1956, the Board created Lane IV of its salary schedule (pertaining to teacher employees) which sought to reward seniority by providing "steps" on the different "lanes" which were themselves designed to acknowledge academic achievement by different levels of base pay. Lane IV affords the highest base pay of the four "lanes." Section 4-28(g) of the Rules of the Board of Education, agreed by both parties to be the applicable and controlling section, provides:

> Lane I requires a Bachelor's Degree, Lane II requires a Master's Degree, Lane III requires a Master's Degree plus thirty-six semester hours of graduate credit approved by the General Superintendent, and Lane IV requires a Ph.D. or Ed.D. Degree.

On September 27, 1956, when plaintiff applied for Lane IV placement, he held a Master of Arts degree from Fordham University; had successfully completed eight graduate semester hours beyond the Master's degree at New York University, fifty-seven semester hours beyond the Master's degree at the University of Chicago, three additional graduate courses at the University of Naples (Italy); had written a doctoral thesis which had been accepted by the University of Naples; and had been awarded the degree of Laurea DiDottore in Lettere, or Doctor of Letters, by that University.

The Board then wrote to the U. S. Office of Education inquiring about plaintiff's degree, and received the following reply:

> Dear Mr. Schloerb:
> In response to your letter of October 22, 1956, we are writing you about the education in Italy of Joseph Cinquino.
> The credential presented, from the University of Naples, certified that Mr. Cinquino passed examina-

tions on November 24, 1954, for the degree of Doctor of Letters.

On the basis of Mr. Cinquino's M.A. degree from Fordham University in 1934 and 56⅔ semester hours of graduate work at the University of Chicago between 1947 and 1950 plus the examinations for the degree of Doctor of Letters from the University of Naples, *it might be considered that Mr. Cinquino's education would correspond roughly to a Doctor's degree in the United States.*

Sincerely yours,
Alina M. Lindegren

Specialist, Comparative Education Europe and the British Commonwealth

Division of International Education

An identical letter was also received from George A. Male, Specialist, Western Europe, Comparative Education Branch, Division of International Education Studies and Services. Subsequently, the Board wrote to Mr. Cinquino relating this evaluation, stating that the Appeals Committee had reviewed his application, and advising him that their records showed only that he had passed the examination for Doctor of Letters, adding:

The Appeals Committee is not able to take positive action on your request for recognition until we have a positive statement that a Doctor's degree was awarded.

If you can secure the above, please send the official statement to us.

No mention was made that the degree was insufficient for Lane IV placement, because it was not a Ph.D. or an Ed.D.

The evidence is not clear as to the failure of the Board to place plaintiff on Lane IV at that time, or following a second application made in May 1957. The Assistant Superintendent in Charge of Personnel, who came into that department in 1959 and was in charge thereof at the time plaintiff was placed on Lane IV, testified that the applications prior to 1959 were rejected because plaintiff did not have a Ph.D. or Ed.D. degree. However, plaintiff referred to the letters quoted above and also pointed out that this witness was not in the department at the times in question, and, further, that he, plaintiff, was never advised that his application had been officially denied.

In June of 1957, at the suggestion of the Board, plaintiff wrote to the University of Chicago for an evaluation of his Italian degree, and was informed that it would give him graduate status at the University of Chicago but was not equivalent to its Ph.D. degree.

After plaintiff had exhibited his Doctor's diploma to an appropriate personnel official of the Board and filed a copy thereof, and following another application for review and evaluation by the Board, plaintiff was placed on Lane IV on October 14, 1959, with such placement and salary retroactively effective as of January 6, 1958. Plaintiff then applied for back salary retroactive to September 27, 1956, the date of his original application. After receipt of this request, the Board reevaluated his academic background, and on April 12, 1961, revoked his placement on Lane IV, returned him to Lane III, and began deducting, without his consent, the sum of $50 per month in order to recover a total of $1,625 which he had received as salary increment while on Lane IV.*

After a series of conferences with Board personnel, through which plaintiff tried unsuccessfully to bring about his reinstatement on Lane IV, this suit was filed.

---

* At the time of trial, defendant had deducted $1,500 in this manner.

At trial, plaintiff sought to introduce evidence that between January 1, 1956 (the effective date of Lane IV) and March 12, 1964, the Board had placed a total of 115 of its teacher employees on Lane IV; that of these 115 teachers, 11, or almost 10% of those on Lane IV, had not been holders of either a Ph.D. or Ed.D. degree; that of these 11 teachers, 5 (including plaintiff) held the degree of Doctor of Letters awarded by various foreign universities, 2 held the degree of Doctor of Medicine, 2 held a Doctor of Music Education, and 2 held a Doctor of Fine Arts degree.

The trial court denied admission of this evidence on the theory, also advanced here by defendant, that section 4–28(g) of the Board's "Rules" specifically required either a Ph.D. or Ed.D. for Lane IV placement; that the literal wording of that section did not recognize equivalent academic achievements. The court also considered it irrelevant that there were 10 other teachers on Lane IV who were not holders of either of those specific degrees, and that only plaintiff had been removed from Lane IV while these others were permitted to remain thereon, holding that the Board was bound by the specific language of its own rule under which plaintiff was not entitled to Lane IV placement.

Following a trial on the merits, the court found that plaintiff's academic background was substantially similar to that required for the award of a Ph.D.; that his original placement on Lane IV was not caused by fraud, duress, or mistake of fact; and that since the rules of the Board specifically required either the Ph.D. or Ed.D. degree which plaintiff did not have, his prayer for restoration to Lane IV should be denied. However, the court did direct the Board to restore to plaintiff the $1,500 which had been deducted from his salary, and found that he was entitled to retain the additional salary paid by reason of his temporary Lane IV status.

Relying upon Aebli v. Board of Education, 62 Cal App 2d 706, 145 P2d 601 (1944), plaintiff contends that once the Board had evaluated his academic background and placed him on Lane IV, it had no power thereafter to reevaluate and revoke his placement. The Board of Education of San Francisco, California, established a "service status rating" for its teachers which reflected years of service in the San Francisco school system and such years of service outside the system for which credit would be given under the rules of the Board. In 1925 the rules specified: "credit on the basis of two years for one may be given for vocational experience in industry or commerce." (145 P2d at 621.) At that time the policy of the Board was to apply very liberally this outside experience rule and grant credit for experience not precisely obtained in "industry or commerce." The court found this to have been within the Board's discretion for the purpose of enabling it to employ and retain better teachers. In 1932, the Board modified and then eliminated this policy of liberal construction, and the question presented in the ensuing lawsuit was what effect the changed policy could legally have on those teachers who had been rated under the pre-1932 policy. The court held that the 1932 Board could not legally affect the pre-1932 status and could not recover money paid as salary, on the theory that the Board in 1932 thought that the Board in 1925 (and during the intervening years) had erroneously granted the credits. Quoting from the opinion below, the court held (145 P2d at pp 621–622):

"The Court finds that the action of said Board in 1932 in reducing and re-rating [the] teachers was not legal for the reason that said teachers had been given their standing in the first instance, not because of clerical error or inadvertence, but in the exercise of discretion and judgment, and however erroneous said judgments may have appeared to the

Board as it was constituted in 1932, said conclusions had nevertheless formed the basis for the contracts between said teachers and said Department for all the school years from their entry into the Department to and including 1931–1932 . . . ."

■ We adopt the Aebli decision as applicable here, and affirm the finding of the trial court that plaintiff is entitled to the full amount paid to him as additional salary during his temporary Lane IV status.

The next question presented in Aebli, as here, is the prospective effect of the Board's changed policy. The court held that the Board did not have the power to reduce the service status ratings (and salaries) for the years post-1932 "where the original ratings were not based on fraud, error, or mistake, and were valid when given . . . ." (145 P2d at 624.) Even though the 1932 Board was trying to correct what it considered mistakes made by previous Boards, the court nevertheless reasserted the finding by the trial court that the pre-1932 Board had acted within its discretion in liberally applying the outside experience rules, and held:

> If a school board could thus change the service status rating of those already in the department every time the personnel of the Board happened to change, or every time the members of the Board determined to change policy, the teachers would have no security at all in their employment and in their seniority rights. There can be no doubt but that the Board could impose a horizontal salary cut on all those within certain ratings. This was done by the several resolutions that "froze" the salaries of certain teachers for certain years. But the teachers are protected against any arbitrary reduction in rank or rating. When the Board has once adopted a policy and, without fraud, error or mistake, rates a teacher

305

under that policy, although the Board may change its policy as to new entrants into the department, it has no power years later to go back and review that teacher's case, and to re-rate that teacher prospectively, on the theory that the original rating was too high. The Board having once acted lawfully in rating a teacher has exhausted its power over that subject matter. (At p 627.)

Another California court considered a similar problem in Barnes v. Board of Trustees of Mt. San Antonio College Dist., 218 Cal App2d 881, 32 Cal Rptr 609 (1963), and adopted verbatim much of the Aebli decision, noting (at page 613) that a petition for hearing had been denied in that case by the California Supreme Court. In Barnes, two teachers had secured approval by the Board to work toward degrees from a nonaccredited college on the understanding that they would receive higher salaries upon successful completion of the requirements provided by that college. The degrees were awarded in June 1959, were accepted by the employer, and the teachers were paid accordingly higher salaries during the school year 1959–1960. For the year 1960–1961, the teachers were placed in a special category created by the Board for degrees earned from nonaccredited institutions, and in 1961–1962, no recognition or salary benefits whatsoever were accorded the nonaccredited degrees.

The court found a waiver by the Board of its accreditation requirements due to the agreement with plaintiffs that their degrees would be accepted, and also held that since the initial recognition was within the power of the Board, it followed, according to the Aebli decision, that the board had exhausted its power to reevaluate the status of the teachers. For the Board to alter the teachers' status would therefore not be permitted, as it would constitute an arbitrary and discriminatory action. (At pages 612–613.)

306

██ We, likewise, hold that once the Board in the instant case had placed plaintiff on Lane IV, its attempt to reevaluate his academic background and revoke his placement constituted an arbitrary and discriminatory action which the law will not countenance, provided plaintiff had not been so placed through fraud, duress, or mistake, and further provided that the Board's initial action had been proper. Considering these two conditions, we affirm the trial court's finding that plaintiff's original placement did not result from fraud, duress, or mistake of fact, but, contrary to the trial court, we also find that plaintiff's placement on Lane IV was proper, it having been within the discretion of the Board to interpret its rules liberally so as to recognize degrees equivalent to a Ph.D. or Ed.D. for Lane IV placement.

The Board is charged with the administration of the school system, and whether it can lawfully exercise discretion in applying its own rules is an important factor in considering how it can best achieve the purposes to which it is responsible. Among these responsibilities is the hiring and retention of the best available teaching staff. Accordingly, the Board is in the superior position to decide whether it is necessary to apply its own rules liberally or literally. A particular teacher with a doctorate in Music might well be among the best qualified music teachers although not literally within the Ph.D. or Ed.D. requirements of section 4–28(g). In granting Lane IV placement to such a teacher, the Board would certainly be acting within the spirit, though not within the letter, of its rule. We are not prepared to hold that such actions are unlawful, particularly in view of the precedents furnished by prior actions of the Board itself.

A memorandum dated June 4, 1956, from the then General Superintendent to the head of the Personnel Department, regarding an application for Lane IV placement on behalf of a holder of an M.D. degree, was

erroneously refused admission into evidence, since it conclusively shows that the policy of the Board was to construe its placement rules liberally. Part of the memorandum stated:

> . . . request that he be certified for placement if his position comes *within the spirit of the Lane 4 salary qualifications*. [Emphasis added.]

On June 14, the head of Personnel wrote to the M.D. applicant:

> Your recent letter to [the General Superintendent] has been referred to me.
>
> Salary adjustments for Lane IV will be processed to become effective September, 1956. *Your letter will be treated as a claim for placement as a result of holding an M.D. degree.* We are assuming that there will be evidence in your personnel folder of the conferral of such a degree.
>
> Even though the adjustment in your salary check may come later in the fall, it will be made retroactive to September 4, assuming of course that your personnel folder will have all the necessary transcripts and credentials. [Emphasis added.]

In addition, the correspondence (set out above) with specialists in comparative education at the U. S. Office of Education, and the suggestion that plaintiff write similarly to the University of Chicago, reveals that the Board in this case engaged in the process of evaluating plaintiff's Doctor of Letters degree. The letter to plaintiff stating that no further action could be taken until it could be known whether the degree had actually been conferred, and the fact of plaintiff's later actual placement on Lane IV are further evidence that the Board had decided to treat plaintiff as it had the ten other teachers with degrees equivalent to a Ph.D. or an Ed.D., thus coming "within the spirit of the Lane 4 salary qualifi-

cations." We are not concerned with whether the Board could reduce the base pay of all those on Lane IV, or whether it could eliminate that salary level altogether. We do decide that the Board cannot lawfully discriminate against one teacher in such a category, and the evidence that ten other teachers received and retained Lane IV placement without specific Ph.D. or Ed.D. degrees constitutes conclusive proof of arbitrary and discriminatory Board action in plaintiff's case.

The Board relies on Whittemore v. People, 227 Ill 453, 470, 471, 81 NE 427, which held that administrative interpretation of a rule is entitled to great weight in a judicial decision only when the rule is not clear or is ambiguous, and permits of interpretation in the first place. See also County of Cook v. Healy, 222 Ill 310, 317, 78 NE 623, and People v. Shedd, 241 Ill 155, 167, 89 NE 332. We consider such reliance to be misplaced, as we believe that the Board itself is in the best position to decide whether its own rule should be construed or interpreted. Further, of course, the Board itself did make that decision when it accepted equivalent degrees as within the spirit of its rule.

The Board also relies on People ex rel. Jacques v. Sheehan, 33 Ill App2d 14, 178 NE2d 193; People ex rel. Laist v. Lower, 251 Ill 527, 96 NE 346; and People v. Frazier, 219 Ill App 234. Those cases hold that an agency or commission can be compelled to rectify errors in employee placement if they had occurred through mistakes in applying employment criteria. We do not consider these authorities to be in conflict with our holdings here.

To distinguish its decision that a Board must rectify an error which occurred because of a mistake in fact from the rule to be applied where no such mistake appears (the situation presented on this appeal), the court, in Jacques, quoted from People ex rel. Gaynor v. Board of Fire & Police Com'rs of Oak Park, 14 Ill App2d 329,

336, 144 NE2d 763, which refused to allow a Board to make a change:

"In the instant case it was not a mistake of fact nor a misinterpretation of its rules which the Board attempted to correct .... It was a change of mind with respect to the weight to be given seniority." (33 Ill App2d at 19.)

The Board in the instant case was not correcting a mistake of fact; it was patently attempting to rectify what it thought had been a mistaken policy, and as such cannot lawfully affect plaintiff's Lane IV status.

One further point contained in the complaint before the trial court and mentioned, though not briefed, on this appeal, is the question of whether plaintiff is entitled to payment of the Lane IV salary increment retroactive to the date of his original application, on September 27, 1956. Placement was granted on October 14, 1959, retroactively effective as of January 6, 1958. There is no evidence in the record to show a Board policy or rule governing the dates on which placements are to become effective. As with the decision we have reached, the actions of the Board in relation to other teachers would be highly significant in this regard. Because of the trial court's decision that plaintiff could be removed from Lane IV, this question was not reached. Therefore, we remand this case for a hearing and decision on that limited issue. Otherwise, the trial court is affirmed in its findings that plaintiff's original placement on Lane IV did not result from fraud, duress, or mistake of fact, and that plaintiff is entitled to the additional salary payments made by reason of his temporary Lane IV status. We reverse the judgment insofar as it is inconsistent with our decision that plaintiff was unlawfully removed from Lane IV and was entitled to retain his

place thereon, and that he also is entitled to the salary increment of which he was deprived.

Affirmed in part, reversed in part and remanded with directions.

DRUCKER and McCORMICK, JJ., concur.