NORTHERN WYOMING COMMUNITY COLLEGE DISTRICT, State of Wyoming, Appellant (Respondent below),

v.

James N. NIPPS, Appellee (Petitioner below).

No. 4872.

Supreme Court of Wyoming.

July 31, 1978.

Robert E. Holstedt and William K. Archibald, of Holstedt & Archibald, Sheridan, for appellant.

Rex O. Arney, of Redle, Yonkee & Arney, Sheridan, for appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

ROSE, Justice.

This appeal, from a district court reversal of an administrative decision rendered by the Board of Trustees of Northern Wyoming Community College District, located at Sheridan, Wyoming, concerns the application of a revised salary schedule to the appellee—a faculty member at the College. The district court found that the Board's decision, denying appellee's request that he be advanced on the 1976–77 salary schedule, was arbitrary, capricious and characterized by abuse of discretion. We disagree and, therefore, will reverse the district court and reinstate the Board's decision.

## FACTS

The appellee, James N. Nipps, joined the College faculty in 1967. Effective September 1, 1970, the Board adopted a salary schedule for instructional staff, wherein faculty members were paid according to years of experience and rank. The schedule provided:

> "Advancement on the salary schedule is not automatic. The faculty member will be evaluated on total performance for advancement."

At the same time, the Board adopted various components of a career plan under which appellee was ranked and paid as an assistant professor. The January 20, 1972, version of the career plan—applicable to all salaries—indicated that academic rank was not the sole consideration to be taken into account in fixing salaries. The March 9, 1972, version of the plan—applicable to rank—indicated under a section entitled, "Criteria for Academic Levels," that:

> "The Associate Professor, in addition to possessing all the qualifications of the Assistant Professor, will:
>
> "1. Possess at least 30 hours beyond the master's degree *and/or other*

*achievements which are appropriate to this rank.*

"2. Have completed a total of three years of teaching.

"3. Possess a record of contributions to the profession extending beyond the school." [Emphasis supplied]

On May 17, 1973, appellee requested and received an advancement to the rank of Associate Professor based on a Board finding of "other achievements." When he received this advancement, appellee had actually earned less than 30 hours beyond his master's degree.

In 1975, the Board eliminated rank classifications for all faculty members and adopted a revised salary schedule effective for the 1975–76 academic year. Thereafter, rank was no longer a basis for salary consideration. Faculty members were, however, placed on the new salary schedule according to the rank they held at the time of its implementation. As directed by the revised policy, appellee was placed in the "MA + 30" column of the new schedule, and thereby received a salary increase from $12,275 to $14,660 a year.

Although rank was used for *initial* placement on the new schedule, it, nevertheless, went on to provide:

"Those faculty members who are placed according to rank *must meet all credit requirements for the next column before additional columnar changes can be attained.*" [Emphasis supplied]

On May 16, 1975, appellee requested—for purposes of his 1976–77 salary—that he be placed on the appropriate step of the "MA + 45" column of the schedule. When this request was made, appellee had earned only a total of 29 credit hours beyond his master's degree—however, he had earned 15 of these hours since being appointed an associate professor. The Board denied the request and, after an administrative hearing, found that appellee did not meet all credit requirements of advance college credits for advancement to the "MA + 45" credit hour column. It is the reversal of this decision which the Board now appeals.

## THE ISSUE

The sole issue with which we are concerned is whether the Board arbitrarily or capriciously applied the 1975 salary schedule to appellee. Appellee contends that the Board improperly rejected and failed to give meaning to its previous decision that appellee had the "equivalent" of 30 credit hours beyond his master's degree. The result of this rejection, says appellee, is to impermissibly engage in a re-evaluation of his status as formulated under previous salary schedules. In response, the Board urges that it did not re-evaluate or re-rate the appellee, and that its new salary policy was reasonable.

## HOLDING

The board is given, by statute, the authority to prescribe and enforce rules and regulations governing the Northern Wyoming Community College. Section 21–18–206(a)(i), W.S.1977. The courts may set aside the governing board's application of such regulations only where the board acts arbitrarily or fraudulently, or where there is an illegal exercise of discretion; and the burden of proving such defects is on the complainant. *Associated Enterprises, Inc. v. Toltec Watershed Improvement District,* Wyo., 578 P.2d 1359; and *Wyoming Bancorporation v. Bonham,* Wyo., 527 P.2d 432. See, *Richards v. Board of Education of Township High School District No. 201,* 21 Ill.2d 104, 171 N.E.2d 37. In deciding whether appellee sustained that burden in this case, we begin with the proposition that

". . . teachers are protected against any arbitrary reduction in rank or rating. When the Board has once adopted a policy and, without fraud, error or mistake, rates a teacher under that policy, although the Board may change its policy as to new entrants into the department, *it has no power years later to go back and review that teacher's case, and to re-rate that teacher prospectively, on the theory that the original rating was too high.* The Board having once acted lawfully in rating a teacher has exhaust-

ed its power over that subject matter." [Emphasis supplied] *Aebli v. Board of Education,* 62 Cal.App.2d 706, 758, 145 P.2d 601, 627. See, *People v. Board of Education of City of Chicago,* 86 Ill. App.2d 298, 230 N.E.2d 85.

The threshold inquiry, then, is whether appellee proved that he was re-rated. If there was no re-rating or re-evaluation, there can be no basis upon which to conclude that the Board's action was arbitrary or capricious—especially in light of appellee's concession that he does not question the validity of the new salary schedule, only its application to him.

■ In the instant case, the Board—in 1973—classified the appellee as an Associate Professor based on "other achievements which are appropriate to this rank." In 1975, under the revised career plan, appellee was placed in the "MA + 30" salary column because of the rank held by him at the time of the plan's implementation. Assuming, arguendo, that this Board action constituted a recognition that appellee possessed the "equivalent" of 30 credit hours beyond his master's degree *for the purpose of initial placement on the schedule,* it does not follow that the Board has thereby rated appellee's qualifications as "equivalent" to 30 hours of earned credit *for placement in a higher salary class* available only to faculty members who have actually earned the requisite number of credit hours or the requisite degree. It is noted that under the career plan in effect when appellee received his associate professorship, in order to be promoted to the rank of Professor, he would have been required to show that he possessed "the doctorate and/or other achievements which are appropriate to this rank." In other words, the Board would have evaluated appellee's achievements to determine if they were "equivalent" to a doctorate degree. This is different than saying the Board would have taken appellee's deemed equivalency of 30 hours' credit beyond his master's degree, calculated additional credit hours earned, and then determined if the total number of deemed and earned hours equalled the credit hours re-

quired for a doctorate. Yet, this is essentially what appellee seeks to have done under the new salary schedule. Additionally, even if the Board had followed the last-mentioned course, academic rank was—under the Board policies—not the sole factor for salary determination.

■ Instead of indicating that the equivalency of 30 credit hours would be the sole determining measure for salary-fixing purposes, the Board specifically provided in the 1975 career plan that to advance to the *next salary column* the faculty member "must meet *all credit requirements* for the next column." While appellee suggests this means that he had to earn only 15 additional hours, the policy and the testimony adduced—at the administrative hearing—indicates conclusively that it was the Board's intention that all faculty members, *without exception,* wishing to advance to the "next column" would have to be possessed of 45 credit hours. Such a conclusion in no way caused a re-rating of appellee's status. As stated in a factually-similar case:

". . . [T]he instant Board did not re-rate and place the petitioner teachers in a different class than that in which they previously had been placed. The Board policy relied upon by the teachers in the case at bar was to place in 'Class E' those teachers who had Doctor's degrees or 72 units of graduate work. Under that policy the Board determined that although the petitioner teachers did not have Doctor's degrees, they did have 72 units of graduate work and gave them a 'Class E' rating. If the Board, at its July or August meeting in 1962, had concluded that the petitioner teachers' graduate units, in their opinion, were not of the quality entitled to consideration for an 'E' classification, or that 72 graduate units were not to be deemed the equivalent of an earned doctorate for an 'E' class placement, and on that basis placed petitioner teachers in 'Class D,' the situation would simulate that considered in the cited case, viz, *Aebli v. Board of Education,* supra, 62 Cal.App.2d 706, 145 P.2d 601. However, the teachers in question

were not placed in 'Class D'; were not paid a 'Class D' salary; and, thus, were not reduced in classification either directly or indirectly.

"The fact that these teachers, under the 1960–1961 and prior salary schedules, were given the same rating as those who had 'earned doctorates' for the purpose of placing them in 'Class E' did not rate their qualifications as the equivalent of an 'earned doctorate' for placement in a higher class available only to those possessing a Doctor's degree or 90 graduate units. . . . It also is worthy of note that under the prior salary schedules 72 graduate units did not constitute training equivalent to a Doctor's degree but merely were 'deemed' to be training equivalent to such a degree. Accepting the language used in those schedules as declaratory of the Board's action, it is apparent that the use of the term 'equivalent' was not intended to indicate a determination that for all salary purposes a teacher who had 72 graduate units possessed the same qualifications as a teacher who had a Doctor's degree. Petitioners' argument is based on a misconception of the Board policy, expressed in the 1960–1961 and previous salary schedules, which was limited to a declaration that 72 graduate units were deemed to be the training equivalent of a Doctor's degree only for the purpose of entitlement to a 'Class E', rating, and not for all purposes. As heretofore indicated, this policy has not been changed. Pursuant thereto the board rated the petitioners as 'Class E' teachers. This rating has not been reduced. Instead of downgrading the teachers who had 72 units, the board upgraded those having a Doctor's degree. The obvious and expressed reason for requiring an 'earned doctorate' or 90 graduate units as a prerequisite for the achievement of the $10,000 salary bracket was to encourage teachers to supplement their academic training and thus to increase the caliber of the teaching staff. The action taken was not arbitrary, discriminatory or unreasonable." *San Diego Federation of Teachers v. Board of Education*, 216 Cal.App.2d 758, 764–766, 31 Cal.Rptr. 146, 149–150.

In the present case, as in the *San Diego* case, supra, there was no reduction in appellee's classification—there was only an upgrading of those faculty members who possessed earned as opposed to deemed credit hours. We see nothing unreasonable or arbitrary about such action.

Reversed. The Board's decision is reinstated.